VINCENT FLACCOMIO and LEE SONNEBORN,

vs.

HENRY P. EYSINK.

*Sales: adulterated articles; dangerous to life or health; vendor's liability; warranties. Appeals: remanding of causes. Joint defendants.*

In an action against a retail whiskey dealer for injuries received by the plaintiff from whiskey adulterated with wood alcohol, which whiskey was labeled and sold to him as "Pure Sherwood," the wholesale dealer from whom the retailer procured the whiskey was joined as co-defendant; it was: *Held,* that in the absence of any evidence to show that the wholesale dealer or his agents knew, or by the exercise of reasonable care could have known, that the whiskey contained wood alcohol, or that his agents were guilty of negligence in the purchase or sale of the whiskey, such wholesale dealer could not be held liable.

p. 374

For such a suit against an immediate vendor to be maintainable, there must be some allegation and evidence of guilty knowledge, fraud, deceit or negligence of the defendant or his agents, or some statute imposing absolute liability upon the manufacturer or vendor in question.                    p. 374

An action can not be maintained on an implied warranty, unless privity of contract is established.                    p. 379

In order to recover for a breach of an implied warranty, or in an action of tort for a false warranty, the plaintiff must by appropriate averments and proof bring the case within one of the sections of the Uniform Sales Act.                    p. 385

As there was in this case no allegation of a warranty of the article sold in any of the counts of the declaration, the Court did not pass upon the sufficiency of evidence to support such an averment.                    p. 385

It is the duty of every person to so conduct his business as not to knowingly or negligently expose others to imminent dan-

ger, and where an injury is sustained in consequence of the violation of that duty, without any negligence on the part of the party injured, justice demands that the guilty party should be held responsible.                              p. 381

The presence of a dangerous ingredient in an article sold may itself justify an inference of negligence on the part of the vendor; but such an inference is not warranted where a merchant deals in an article not generally regarded or known to be dangerous; he simply accepts it in the condition in which he buys it, without any reason to suspect or any means of detecting the presence of the dangerous quality except by a chemical analysis.                              p. 381

In the case of an appeal from a judgment against two joint defendants, if it is necessary to remand the case for a new trial against the one defendant, the Court of Appeals will remand it for such a trial against both, although it may appear that against one of the defendants the action is not maintainable.

                                            p. 386

*Decided December 13th, 1916.*

Appeal from the Court of Common Pleas of Baltimore City. (DAWKINS, J.)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Sidney L. Nyburg* and *Charles F. Stein* (with whom was *Archibald Sykes* on the brief), for the appellant, Lee Sonneborn.

*Harry B. Wolf* submitted a brief for the appellant, Vincent Flaccomio.

*Eldridge H. Young* and *John S. Young* (with whom was *Louis Hollander* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought in the Court below by Henry P. Eysink against Vincent Flaccomio, Lee Sonneborn, trading as Lee Sonneborn & Company, and the Sherwood Distilling Company.

The amended declaration contains four counts. The first count charges that "on or about the 24th day of January, 1913, the said defendants, their agents and servants did illegally and unlawfully have, keep and offer for sale and did sell to the said plaintiff a certain medicinal or chemical preparation or liquid intended for internal use, to wit, whiskey, in which methyl or wood alcohol was used, placed or contained in the stead of spirit, grain or ethyl alcohol, so that said medicinal or chemical preparation or liquid intended for internal use, called or known as whiskey, was dangerous and harmful to be drunk or used internally, which said danger and harm was known or by the exercise of reasonable care could have been known to the said defendants, their agents and servants; that the said plaintiff did not know and was not warned or informed of the harmful or dangerous ingredient or substance contained in said whiskey or liquid, and he, the said plaintiff, did drink the same, whereby, by reason of said harmful substance or ingredient in said whiskey or liquid the said plaintiff was caused to suffer great and permanent physical hurt and injury, and to lose (or impair) the faculty of seeing or sense of sight and became blind," etc.

The second count alleges that the "defendants, their agents and servants, in making, manufacturing, mixing or compounding a certain medicine, medicinal or chemical preparation intended for internal use, to wit: whiskey, did illegally and unlawfully substitute or use methyl or wood alcohol in the place and stead of spirit, grain or ethyl alcohol, so that said preparation or so-called whiskey or liquid was and became so harmful and dangerous for internal use as to endanger the health of persons internally using the same (all of which the said defendants knew, or on account of the said substance being for internal use ought to have been known to the said defendants); that the said defendants, their agents or servants, did (intentionally, wrongfully and illegally offer for sale and sell or) fill certain bottles or glass receptacles with said substance or preparation and keep and offer the same for sale, and that on or about the 24th day of January,

1913, the said plaintiff did innocently purchase certain of said preparation, and without knowledge or warning as to the harmful or dangerous nature of the same, the said plaintiff did drink of said preparation to his great loss, injury and damage," etc.

The third count alleges that the defendants "did (tortiously) illegally and unlawfully and intentionally have, keep and offer for sale and did sell to the said plaintiff a certain medicinal or chemical preparation or liquid intended for internal use, to wit: whiskey, in which methyl or wood alcohol was used, placed or contained in the stead of spirit or ethyl alcohol," so that the said whiskey was dangerous "to be drunk or used internally," and that the plaintiff, not knowing that it was dangerous, did drink of said whiskey and was greatly injured, etc.

The fourth count avers that the defendants, "their agents and servants, made, had or kept and offered for sale a certain beverage, composition or mixture called or labeled whiskey, in the mixture or manufacture of which methyl or wood alcohol, which is of a dangerous and poisonous character so as to require great care in its use and not to be used for internal purposes, was (negligently, fraudulently and) wrongfully used in the place and stead of ethyl or grain or pure alcohol (a much more expensive substance than methyl alcohol), and on or about the 24th day of January, 1913, a bottle or portion of said so-called whiskey was sold to the said plaintiff for internal use," and that the plaintiff "did use and drink" said mixture "without suspicion or knowledge of said danger" and by reason thereof became ill "and lost the sight of his eyes," etc.

The defendants demurred to the declaration, and the demurrer having been overruled, the docket entries state, "pleas 'did not commit the wrongs alleged' were then entered short by all the defendants, and issue joined short." There was a judgment of *"non pros"* as to the Sherwood Distilling Company which the appellee states in his brief was entered at the close of the plaintiff's testimony, and this appeal is by

the other defendants, Vincent Flaccomio and Lee Sonneborn, from the judgment against them in favor of the plaintiff.

The record contains one hundred and fifty-two exceptions. One hundred and fifty-one of these relate to the rulings of the Court below on the evidence, and the remaining exception is to the overruling of special exceptions to the plaintiff's second and seventh prayers; to the granting of those prayers, and to the rejection of certain prayers of the defendants.

The first, second, third, fourth and fifth prayers of Flaccomio, and the five prayers of Sonneborn asked for instructions that under the pleadings there was no evidence in the case legally sufficient to entitle the plaintiff to recover on any of the counts in the declaration. The Court below granted these prayers of the defendant Sonneborn in reference to the first, second and third counts, but rejected his prayers denying the plaintiff's right to recover on the fourth count. The Court also granted the prayer of Flaccomio in reference to the second count, but refused his prayers withdrawing the case from the jury on the first, third and fourth counts. The ruling of the Court on these prayers presents the important and controlling question in the case.

The evidence produced at the trial, assuming that all of it was admissible, shows or tends to show, that in January, 1913, the defendant, Vincent Flaccomio, kept a saloon in Baltimore City at 620 Forrest street. The plaintiff, who at that time lived at 704 East Monument street, near the corner of Forrest and Monument streets, went to Flaccomio's saloon about seven o'clock in the evening of January 24th and asked for a half pint of "Sherwood Whiskey" or "Sherwood Rye Whiskey," and received from the bartender a half pint bottle labeled "Sherwood Rye Whiskey." He took the bottle to his home and he and several friends drank the contents. About a hour later, he went back to Flaccomio's saloon and asked for another half pint of "Sherwood Whiskey" or "Sherwood Rye Whiskey" and the bartender gave him a half pint bottle labeled as the first bottle was, and he and his friends con-

sumed the contents of that bottle. The following afternoon the plaintiff became quite sick and partially blind, and was finally taken to the Presbyterian Eye, Ear and Throat Hospital on the 4th of February, 1913, where he remained for about sixty days under treatment for loss of sight. The physician who attended him at the hospital stated at the trial that his loss of sight was due to wood alcohol poison, and that he would not recover from the effects of it. For the purpose of showing that the whiskey he got from Flaccomio's saloon contained wood alcohol, the plaintiff proved that several other bottles of Sherwood Whiskey purchased by different persons and at different times in February, 1913, from Flaccomio at his saloon on Forrest street contained thirty-five per cent. of wood alcohol. The record does not clearly show from whom Flaccomio got the whiskey that was sold to the plaintiff or the persons who purchased in February the bottles of whiskey containing thirty-five per cent. of wood alcohol. At one point in his testimony Flaccomio stated that at that time he was buying whiskey from the defendant, Lee Sonneborn & Company, and from E. Bruce & Co. At another time he said he was buying his Sherwood Whiskey prior to the sales in question from Lee Sonneborn & Company, and later, when asked if he could tell from whom he got the whiskey sold to the plaintiff, he said he could not say. Flaccomio and his employees testified that he bought the Sherwood Whiskey that he sold in bottles in five and ten gallon demijohns. These demijohns when delivered to him had a card or tag attached to them bearing the name of the whiskey and the name of the person from whom he purchased them. The demijohns were placed in the room where he conducted his saloon, and the bottles were filled in that room from the demijohns as they were needed, and labeled, as to its contents, according to the tag on the demijohn. He got some of the labels from Sonneborn, and the bottles were purchased by him from a number of persons, and were always washed before they were filled with whiskey. They further testified that they never put anything in the whiskey, that they never

had any wood alcohol at his saloon, and that Flaccomio and
his employees sold the whiskey just as it was when he re-
ceived it, and never knew or had any reason to suspect that
any of the whiskey they sold contained wood alcohol. Flac-
comio also testified that he had been buying whiskey from
Lee Sonneborn & Company for a number of years; that be-
fore he began to purchase from Lee Sonneborn he learned
that he was a reliable merchant, and that he had never heard
of any complaints about the whiskey that he, Flaccomio,
sold until the complaint in this case. The record shows that
wood alcohol in taste, odor and intoxicating effect "very
closely" resembles the ordinary grain alcohol, and there is
no evidence to show that its presence in whiskey can be de-
tected except by a chemical analysis.

In respect to the defendant Sonneborn, the evidence shows
that he was in the wholesale liquor business, and had been in
that business for eleven years. He bought his whiskey in
barrel lots, and in the years 1911, 1912 and 1913 he pur-
chased his Sherwood Whiskey from A. J. & A. Freiburg, of
Cincinnati, Ohio; H. H. Shufelt of Peoria, Illinois, and the
Fleichman Company of Cincinnati, Ohio. He had dealt with
these parties ever since he had been in business, and they
were merchants of the highest reputation. The name of the
whiskey was marked on the barrel, and when the barrels of
whiskey are received by him they are rolled in on the floor
of his building and are kept there until they are needed.
When the whiskey is needed in his business a spigot is in-
serted in the barrel, and the barrel is placed on the rack,
and when he gets an order for less than a barrel of whiskey,
he makes out a ticket, bearing the name of the purchaser,
the name of the whiskey and the quantity desired, and places
the ticket on the proper barrel, and then sees that the re-
ceptacles are properly filled from the barrel. The demijohns
in which he sells the whiskey are "filled from the original
barrels just as he got them" from the parties from whom he
purchases, and the demijohns are then tightly corked and

loaded on his wagon for immediate delivery to his customers.
When these demijohns are returned by his customers they
are immediately put into a tank "and soaked and rinsed thor-
oughly and then corked," and when they are needed they are
again "rinsed" before they are filled.  Sonneborn and his
employees further testified that he was not a "rectifier" or
"blender" of spirits, or a manufacturer of liquors; that he
dealt in liquors as a "jobber"; that he never had any wood
alcohol on his premises, never sold any whiskey containing
wood alcohol, and had never had any complaints of any kind
about the whiskey he sold.

As to the defendant Sonneborn, it would seem clear upon
this state of the proof that there was no evidence legally
sufficient to entitle the plaintiff to recover on any of the
counts in the declaration.  If we assume that there was evi-
dence to show that the whiskey that the plaintiff got from
Flaccomio's saloon contained wood alcohol, and that Flac-
comio purchased the whiskey from Lee Sonneborn & Com-
pany, there is not the slightest evidence to show that Sonne-
born or his agents knew, or by the exercise of reasonable care
could have known that it contained wood alcohol, or that he
or his agents were guilty of negligence either in the purchase
or sale of the whiskey.  He was not the distiller or manu-
facturer, or blender or rectifier of the whiskey he sold Flac-
comio, but he simply sold in smaller quantities the whiskey
he purchased in large quantities.  In the absence of some evi-
dence that Sonneborn or his agents knew of the presence of
wood alcohol, or of some evidence of fraud, deceit or negli-
gence on his or their part, there is no ground or principle
upon which he could be held liable under the pleadings in
the case for the injury the plaintiff sustained.

The cases relied on by the appellee do not warrant a differ-
ent conclusion, but in our judgment fully sustain this view.
In the case of *Thomas* v. *Winchester,* 6 N. Y. 397, the
action was brought to recover damages "for negligently put-
ting up, labeling and selling as and for the extract of *dande-*

*lion,* which is a simple and harmless medicine, a jar of the extract of *belladonna,* which is a deadly poison; by means of which the plaintiff, * * * to whom * * * a dose of dandelion was prescribed by a physician, and a portion of the contents of the jar, was administered as and for the extract of dandelion, was greatly injured," etc. The medicine was purchased by the plaintiff's husband at the store of Dr. Foord, a physician and druggist in Madison County, where the plaintiff lived. It was sold for and believed by Dr. Foord to be the extract of dandelion, and he purchased it as the extract of dandelion from J. S. Aspinwall, a druggist in New York, and Aspinwall bought it from the defendant as the extract of dandelion, believing it to be such. The defendant was engaged at No. 108 John street, New York, in the manufacture and sale of certain vegetable extracts for medicinal purposes, and in the purchase and sale of others. The extracts manufactured by him were put up in jars for sale, and those he purchased were put up in like manner. The jars containing extracts manufactured by himself and those containing extracts purchased from others, were labeled alike. Both were labeled like the jar in question, as "prepared by A. Gilbert." Gilbert was a person employed by the defendant at a salary, as an assistant in his business. The extract contained in the jar sold to Aspinwall, and by him to Foord, was not manufactured by the defendant, but was purchased by him from another manufacturer or dealer. "The extract of dandelion and the extract of belladonna resemble each other in color, consistence, smell and taste; but may on careful examination be distinguished the one from the other by those who are well acquainted with these articles." Gilbert's labels were paid for by Winchester, the defendant, and used in his business with his knowledge and assent. The defendant moved for a nonsuit on several grounds. The first of these grounds was, "That the action could not be sustained, as the defendant was the remote vendor of the article in question; and there was no connection, transaction or privity be-

tween him and the plaintiff"; and the sixth ground was, "That there was no sufficient evidence of negligence in the defendant to go to the jury." The lower Court charged the jury that if Aspinwall, Foord and Mr. Thomas were free from negligence, and if the defendant was guilty of negligence in putting up and vending the extract in question the plaintiff was entitled to recover, provided the extract administered to the plaintiff was the same put up by the defendant and sold by him to Aspinwall and by Aspinwall to Foord. In sustaining the instruction granted by the lower Court, the Court of Appeals of New York, speaking through CHIEF JUDGE RUGGLES, said: "The case depends on the first point taken by the defendant on his motion for a nonsuit; and the question is, whether the defendant, being a remote vendor of the medicine, and there being no privity or connection between him and the plaintiff, the action can be maintained.

"If, in labeling a poisonous drug with the name of a harmless medicine, for public market, no duty was violated by the defendant, excepting that which he owed to Aspinwall, his immediate vendee, in virtue of his contract of sale, this action can not be maintained. If A. build a wagon and sell it to B., who sells it to C., and C. hires it to D., who in consequence of the gross negligence of A. in building the wagon is overturned and injured, D. can not recover damages against A., the builder. A.'s obligation to build the wagon faithfully, arises solely out of his contract with B. The public have nothing to do with it. Misfortune to third persons, not parties to the contract, would not be a natural and necessary consequence of the builder's negligence; and such negligence is not an act imminently dangerous to human life * * *.

"But the case in hand stands on a different ground. The defendant was a dealer in poisonous drugs. Gilbert was his agent in preparing them for market. The death or great bodily harm of some person was the natural and almost inevitable consequence of the sale of belladonna by means of the false label. Gilbert, the defendant's agent, would have

been punishable for manslaughter if Mrs. Thomas had died in consequence of taking the falsely labeled medicine. Every man who, by his culpable negligence, causes the death of another, although without intent to kill, is guilty of manslaughter. * * * A chemist who negligently sells laudanum in a vial labeled as paregoric, and thereby causes the death of a person to whom it is administered, is guilty of manslaughter. * * * In respect to the wrongful and criminal character of the negligence complained of, this case differs widely from those put by the defendant's counsel. No such imminent danger existed in those cases. * * * The defendant's negligence put human life in imminent danger. * * * In *Longmeid* v. *Holliday* (6 English Law and Eq. Rep. 562), the distinction is recognized between an act of negligence imminently dangerous to the lives of others, and one that is not so. In the former case, the party guilty of the negligence is liable to the party injured, whether there be a contract between them or not; in the latter, the negligent party is liable only to the party with whom he contracted, and on the ground that negligence is a breach of the contract." We have quoted from Thomas vs. Winchester at some length because it is referred to by the appellee, and in many of the later cases, as the leading case on the subject, and because it shows conclusively that the plaintiff's right to recover was based on the averment and proof of the defendant's *negligence* in labeling and selling a deadly poison.

In the case of *Hoover et al.* v. *Peters,* 18 Mich. 51, where the purchaser, who purchased for consumption, was allowed to recoup for meat that was unsound on the ground of an implied warranty of soundness, the Court said in reference to sales to a *dealer*: "It seems to be settled by many authorities that no implied warranty of soundness arises where such articles are purchased by a dealer to sell again." In the case of *Boyd* v. *Coca-Cola Bottling Works,* 177 S. W. Rep. 80, suit was brought against the Bottling Works for injuries caused by its negligence in selling a bottle of coca-cola in

which there was a cigar stub, and the Supreme Court of Tennessee in its opinion said: "Practically all of the modern cases are to the effect that the ultimate consumer of foods, medicines and beverages may bring this action against the manufacturer for injuries caused by the negligent preparation of such articles." In the case of *Crigger* v. *The Coca-Cola Bottling Company*, 179 S. W. Rep. 155, where the suit was instituted to recover for injuries caused by drinking a bottle of coca-cola, sold by the defendant to a dealer and by him sold to the plaintiff, containing a decomposed mouse, the Supreme Court of Tennessee, after a careful review of the authorities in that and other States, said: "This liability is based on an omission of duty or act of negligence, and the way should be left open for the innocent to escape. However exacting the duty or high the degree of care to furnish pure foods, beverages and medicines, we believe with JUDGE COOLEY, as expressed in *Brown* v. *Marshall, supra* (47 Mich. 576), that negligence is a necessary element in the right of action, and the better authorities have not gone so far as to dispense with actual negligence as a prerequisite to the liability. In fact, there is no logical basis of liability for personal injury without some negligent act or omission." In *Norton* v. *Sewall*, 106 Mass. 143, the Court in sustaining the judgment for the plaintiff said: "Upon the allegations of the declaration, and the statements in the bill of exceptions, the jury must be taken to have found that the defendant, an apothecary, by his servant, negligently sold, as and for tincture of rubarb (a well-known and harmless medicine), two ounces of laudanum, a dangerous and deadly poison, to Patten, who procured it for the purpose of administering it, and did administer two ounces of it, as a medicine, to his servant, the plaintiff's intestate, from the effects of which he died." In all of the other well considered cases relied on by the appellee it will be found upon careful examination that where the suit was not against the *immediate vendor* the right to recover was based upon some averment and evidence of guilty knowl-

edge, fraud, deceit or negligence of the defendant or his agents, or some statute imposing absolute liability upon the manufacturer or vendor of the article in question.

The only case in this State having any bearing upon the question here involved is the case of *State, use of Hartlove,* v. *Fox,* 79 Md. 514, where a suit was brought to recover for the death of Hartlove, alleged to have been caused by glanders contracted from a horse purchased by the decedent's brother from Fox, and where this Court, after reviewing many of the cases relied on by the appellee in this case, said through the present Chief Judge: "We have referred to a number of cases which present various phases of such questions as may reflect upon the one before us. Without deeming it necessary to pass upon all of them or to go to the full extent that *Thomas* v. *Winchester* has gone, we are of the opinion that the authorities and a proper regard for the protection of innocent persons fully justify us in the conclusion that if a vendor sells any property which he knows to be imminently dangerous to human beings and likely to cause injury to an innocent vendee who is not aware of the danger and to whom false representations have been made as an inducement to the sale he may under proper allegation and proof, be held responsible not only to the vendee, but to such person or persons as the vendee may in the ordinary course of events call upon to take charge of the property for him."

There is no allegation of a breach of warranty in any of the counts in the declaration, and even if there was, Sonneborn did not sell to the plaintiff, and the cases to which we have referred and others cited by the appellee recognize the established rule that the action cannot be maintained on the theory of an implied warranty where there is no privity of contract. In the case of *Roberts* v. *Anheuser-Busch Brewing Association,* 211 Mass. 449, 98 N. E. 95, in a suit to recover for ptomaine poisoning from a bottle of Malt Nutrine, the Court said: "While there may be no inherent difficulty in maintaining an action of tort upon a false warranty, it yet

remains true that there cannot be a warranty where there is no privity of contract. It cannot be found that there was a particular contract when there was no contract whatever. If there has been no contractual relation between the plaintiff and defendant, the action cannot be maintained upon the ground that there was any warranty by the defendant of the good quality of its mixture. *Davidson* v. *Nickols*, 11 Allen, 514. Nor did the plaintiff state such a cause of action."

It is said in 1 *Shearman & Redfield on Negligence*, sec. 13, that the violation of a statute, "established for the benefit of private persons," is itself sufficient to prove such a breach of duty as will sustain a private action for negligence, if the other elements of actionable negligence concur, and that the true rule in such cases is that the violation is presumptive evidence of negligence, and the plaintiff contends that the defendants have violated sec. 211 of Article 27, Vol. 3 of Bagby's Code, which provides that: "Any person, firm or corporation engaged in the business of making, manufacturing, compounding or dispensing drugs, medicines, medicinal or chemical preparations for human consumption, who shall in person or by his, their or its agents or employees, make, mix, manufacture, compound, dispense, sell, or deliver to any person, any drug, medicine, medicinal or chemical preparation, intended for internal use, wherein ethyl, or grain alcohol usually enters as a part of, or is in anywise employed in the making, mixing or manufacture, compounding or preparation of such drugs, medicine, medicinal or chemical preparation; who shall, in the making, mixing, manufacturing or compounding of such drug, medicine or medicinal or chemical preparation, substitute or use, in part or in whole, methyl, or wood alcohol, in the place and stead of ethyl, or grain alcohol or who shall in any manner put or introduce methyl, or wood alcohol, into such drug, medicine or medicinal or chemical preparation shall be guilty of a misdemeanor," etc. Even if it could be said that the defendants were "engaged in the business of making, manufacturing, compounding or dispens-

ing drugs, medicines, medicinal or chemical preparations" there is no evidence in the case that they mixed, made, manufactured or compounded the whiskey sold to the plaintiff or that they introduced wood alcohol into the same.

It is the duty of every person to so conduct his business as not to knowingly or negligently expose others to imminent danger, and where an injury is sustained in consequence of the violation of that duty, without any negligence on the part of the party injured, justice demands that the guilty party should be held responsible. And there may be cases where the presence of a dangerous ingredient in the article sold may in itself justify an inference of negligence on the part of the defendant. But such an inference is not warranted where a merchant deals in an article not generally regarded or known to be dangerous and simply sells it in the condition in which he buys it, without any reason to suspect, or any means of detecting the presence of the dangerous quality except by a chemical analysis.

What we have said in reference to the evidence in regard to Sonneborn applies to the defendant Flaccomio. There is no evidence that he or his agents knew that the whiskey contained wood alcohol, or that they were guilty of negligence in handling or selling it. According to the proof in the case the bottles were filled from the demijohns in which he purchased the whiskey, and it was sold in the condition in which he bought it.

In 1 *Elliott on Contracts,* 222, it is said: "If food is sold to the purchaser to be used directly for domestic consumption, there is, as between the dealer and consumer, an implied warranty that the articles are sound and wholesome and fit for the purposes for which they were sold." Many of the earlier cases in support of this general statement of the rule are collected in a note to *Hunter* v. *State,* 73 Am. Dec. 164, and some of the later cases dealing with the same question are referred to in 11 *R. C. L.,* pp. 1118-1121, and 35 *Cyc.* 406-407.

Sections 35 and 36 of Art. 83 of the Code of 1912, which are a codification of sections 32 and 33 of the Uniform Sales Act of 1910, Ch. 346, however provide: "35. Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the descriptions," etc.

"36. Subject to the provisions of this sub-title and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose," etc.

In the case of *Wren* v. *Holt* (1903), 1 K. B. 610, the action was brought to recover damages for a breach of warranty in respect to beer bought by the plaintiff in the beer house of the defendant and consumed on the premises. "The house was a tied house, and the only beer supplied was that of Messrs. Holden & Co., Limited. The plaintiff was aware of this fact, and in his evidence he said that when he went to the defendant's house he expected to get Holden's beer and

nothing else. The allegation was that the beer contained arsenic, and that he had suffered from arsenic poisoning." The jury found that the plaintiff did not rely for the good quality of the beer on the skill and judgment of the defendant. LORD JUSTICE VAUGHAN WILLIAMS, after quoting subsections 1 and 2 of the English Sale of Goods Act of 1893, which are the same as sub-sections 1 and 2 of sec. 36 of Art. 83 of our Code, said: "Speaking candidly, I do not think, taking the generally accepted view of lawyers as to the meaning to be attached to the words 'by description' as applied to a sale, that a sale of goods over a counter, where the seller deals in the description of goods sold, is a sale of goods by description within this sub-section. But in this case we have to consider the findings of the jury. They departed from their first finding, that the customer did rely on the skill and judgment of the seller, and adopted the suggestion of the learned judge that the plaintiff went to this beer house in which Holden's beer was kept for the purpose of sale, and asked to be supplied with beer of that description. The reason of the jury for ultimately saying that the plaintiff did not rely on the skill and judgment of the defendant was that the plaintiff was asking for beer of a specific description. Under these circumstances, and in this particular case, though the sale was one of beer in a beer house, if the finding of the jury is accepted there was a sale by description. If so, there was an implied warranty under sub-section 2 that the goods should be of a merchantable quality. This beer, by reason of the presence in it of arsenic, was not of a merchantable quality." LORD JUSTICE STIRLING said that he was of the same opinion, and LORD JUSTICE MATHEW said: "I am of the same opinion. * * * The section we are concerned with is section 14. This case, in view of the finding of the jury that the plaintiff did not rely on the skill and judgment of the seller, cannot be brought within sub-section 1, but in my judgment it comes within the plain words of sub-section 2. The purchase by the plaintiff was

of goods bought by description from a seller who dealt in
goods of that description, and it was an implied condition
that the goods should be of a merchantable quality. The
case does not come within the proviso, for the defect was not
one that examination could reveal. It is not, to my mind,
any answer to the case set up by the plaintiff that the goods
were bought across the counter. I agree, therefore, that the
verdict for the plaintiff ought to stand." In the case of
*Quemahoning Coal Co.* v. *Sanitary E. S. Co.*, 95 Atl. 986,
the Court of Errors and Appeals of New Jersey held that in
a contract to sell a quantity of a certain kind of coal gotten
from certain mines and known by the trade name of "Ran-
dolph Smokeless Coal," came under sub-section 4 of the
Sales Act relating to sales of a specific article under its
patent or other trade name, and that there was no implied
warranty as to its fitness for any particular purpose. In
the cases of *Gearing* v. *Berkson, et al.*, 111 N. E. 785, the
Supreme Judicial Court of Massachusetts quotes sub-sections
1 and 3 of the Sales Act and then says: "Even before the
enactment of this statute, it was recognized as the law in this
commonwealth, that where the buyer at a shop relies on the
skill and judgment of the dealer in selecting food, and it is
made known to the dealer that his knowledge and skill are
relied on to supply wholesome food, he is liable if it is not fit
to be eaten; while, in case the buyer himself selects pro-
visions, the dealer's implied warranty does not go beyond the
implied assertion that he believes the food to be sound. * * *
The application of this rule of law to the facts as found by
the trial judge is decisive in the action of Percy A. Gearing.
His wife, acting as his agent, left to the defendant the
selection of the meat, and paid for it at the current price for
sound, wholesome pork chops. See *Hunt* v. *Rhodes Bros. Co.*,
207 Mass. 30, 92 N. E. 1001. The defendant Freshman
undertook to make the selection so left to him. The meat
was cooked, and was eaten by the plaintiff and his wife, and
both were made sick 'because of the unwholesome, unsound,

poisonous or unfit quality or condition of said pork chops.' The order of the Appellate Division in this action must be affirmed. In the action of the wife, Katherine Gearing, the Appellate Division ordered judgment for the plaintiff on the first count of her declaration, and from this the defendants appealed. The count is apparently framed in contract, for breach of an implied warranty or condition of fitness for food. The declaration purports to be 'in tort,' presumably on the theory that an action of tort may be maintained upon a false warranty. The difficulty with the case on this ground is that there was no contractual relation, and hence no warranty, between Mrs. Gearing and the defendants. The only sale was that made to her husband through her as his agent; and a cause of action in contract accrued to him thereon, as above set forth. The implied warranty, or to speak more accurately, the implied condition of the contract, to supply an article fit for the purpose required, is in the nature of a contract of personal indemnity with the original purchaser. It does not 'run with the goods.' " After referring to the second count in Mrs. Gearing's case, which was in tort for negligence, the Court further said: "But that is controlled by the finding of the judge, that no negligence in fact was shown on the part of the defendants. In the absence both of an implied warranty and of negligence on the part of the defendants, the action of Mrs. Gearing fails." In *Wasserstrom v. Cohen, Frank & Co.,* 165 App. Div. 171, 150 N. Y. Supp. 638, it was held, that to bring a case within the Sales Act, sub-section 1, it must appear that the seller was informed expressly or by implication of the purpose for which the goods were purchased, and that the buyer relied on the seller's skill and judgment, and in *Kansas City Bolt and Nut Co. v. Rudd.* 220 Fed. 750, the Court said that sub-sections 1 and 4 of the Sales Act enact the common law rule unless section 1 substitutes a question of fact for the presumption that the buyer relied on the seller's skill and judgment. We have referred to the above cases as showing the

views of the Courts mentioned as to the proper application of the provisions of the Act in question, and we may refer also to the cases of *Warren Glass Co.* v. *Keystone Co.,* 65 Md. 547; *Farren* v. *Dameron,* 99 Md. 323, and *Com. Realty Co.* v. *Dorsey,* 114 Md. 172, for a statement of the rule in this State without reference to the Uniform Sales Act.

It is clear that in order to recover for a breach of an implied warranty, or in an action of tort for a false warranty, the plaintiff must by appropriate averments and proof bring the case within one of the sections of the Uniform Sales Act. There is, however, no allegation of a warranty of the article sold in any of the counts of the declaration in this case, and we are not, therefore, called upon to determine whether there is any evidence in the case to support such an averment.

It follows from what has been said that there was error in the rejection of Flaccomio's first, second, fourth and fifth prayers, and in the rejection of the prayers of the defendant, Sonneborn, and the judgment must, therefore, be reversed.

If the judgment was against Sonneborn alone we would reverse it without awarding a new trial, as there is no evidence in the record to sustain a verdict against him upon any theory of the case. But as we cannot, according to the practice of this Court, award a new trial as to one of the defendants without awarding it as to both (*Ewing* v. *Rider,* 125 Md., p. 156), we will reverse the judgment, without now awarding a new trial, but with leave to the appellee to apply to this Court for an order granting a new trial, and then determine whether it shall be awarded.

*Judgment reversed, with costs to the appellants.*