OTIS ELEVATOR COMPANY *v.* EMBERT, USE AND
BENEFIT OF SOUTH STREET CORPORATION

[No. 46, October Term, 1951.]

*Decided December 7, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Michael Paul Smith* and *W. Albert Menchine* for the appellant.

*G. C. A. Anderson*, with whom were *Anderson & Barnes* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a judgment for plaintiff in a negligence case for personal injuries sustained in a passenger elevator. Plaintiff sued the building company, as owner of the building and the elevator in it. The building company impleaded Otis Elevator Company, as a third-party defendant, alleging that Otis was liable to the building company for breach of a contract to furnish maintenance on the elevator in question and another in the same building. Plaintiff filed an amended declaration against the building company and Otis, alleging negligence of each. The case, including the third-party action, was tried before a jury, which found a verdict for plaintiff against both defendants, and for Otis in the third-party action. Otis has appealed. The building company did not appeal, but paid the judgment, which was entered to its use. This appeal is defended by the building company, as use plaintiff.

The accident occurred on May 11, 1949, about ten o'clock in the morning. It was daylight, but the electric lights in the building "burn all the time". The build-

ing was then under lease to the United States. Under the lease the building company was charged with maintenance of the elevator. Plaintiff, who was sixty-one, was a legal examiner in the Bureau of Internal Revenue. She had worked in the building about eighteen months. There are four main floors in the building, a basement and two mezzanine floors. There were two elevators, side by side. The one in question, on the right, was an automatic elevator, the other, to the left, was not. The Government employees were supposed to use the automatic. Taxpayers and the general public also used it. Above the push buttons beside the elevator shaft were small signs, "Employees only." When plaintiff went to work in the building she was instructed in the operation of the elevator by another Government employee. During the eighteen months she was there, there were no signs on the elevator instructing people how to operate it.

On each floor there is an outer door to the elevator shaft, which is opened horizontally by manually pulling it with a handle, from left to right on the outside, from right to left inside, and closes automatically. The elevator itself has an inner grilled door which is similarly opened and closed manually. In the left of two panels of the outer door, at about eye level, is a diamond shaped window, about twelve by eight inches. In the top of the elevator, in the center, half inside and half outside, is a large dome light. Through the window light is visible from the inside of the car when the car is at or within several feet above the floor and from the top when the top is below the window, but the globe itself is not visible except to one peering closely through the window to look at it. From the time the top of the car approaches the window, e. g., reaches the floor level, till the bottom passes the window, the window shows light, but does not indicate the position of the car within these limits, except to one who looks directly through the window to see. In a panel to the left of the outer door are up and down buttons, to be pushed to bring the car to the floor, and a light that flashes, "Car coming".

When the car arrives at the floor (without passengers) the inner door is generally open and the outer door is opened manually. After the passenger enters the car the outer door closes automatically. On a panel within the car are buttons to be pushed to indicate the floor to which the car is to go. When a passenger (or any weight in excess of a low maximum) is in the car, the car will not move unless both doors are closed. If, when the car is in motion the inner door is opened, the car immediately stops. The outer door cannot be opened while the car is in motion. Before the accident it could not be opened from the inside or from the outside unless the car was within thirteen inches above or below the floor level. The outer door locks were controlled by a cam twenty-seven inches long (vertically) attached to the elevator. When the car stopped, the cam opened a door lock anywhere within the range of its own length, i. e., when the floor of the car was within thirteen inches above or below the building floor level. When the car was within thirteen inches of the floor level, the outer door could be opened either from the inside or from the outside. When it was beyond the thirteen inch distance from the floor, the outer door could not be opened from the inside or the outside. When it was stopped either within or beyond the thirteen inch distance, it could not, by either the outside or inside push buttons, be brought nearer the floor level previously selected by the passenger. It could only be brought to some other floor.

This elevator is an Otis elevator. It was installed by Otis in 1930. Since 1942 it has been maintained by Otis under a maintenance contract. The first contract was superseded by a contract of May 5, 1947, which was in force at the time of the accident. Otis has two regular types of contracts (1) a service contract to oil and grease only, unless called upon for other service if anything happens to the elevator, and (2) this full maintenance contract.

The 1947 contract was in a standard printed form used throughout the country, applicable alike to automatic and other elevators, with no distinction in terms between them, and in fact covers both of the building company's elevators. By the contract Otis undertakes "to furnish OTIS MAINTENANCE" on the two specified elevators, to "maintain the entire elevator equipment on the terms and conditions * * * set forth", to "use trained men directly employed and supervised by us", who "will be qualified to keep your equipment properly adjusted, and * * * will use all reasonable care to maintain the elevators in proper and safe operating condition", to "regularly and systematically examine, adjust, lubricate as required, and if, in our judgment, conditions warrant, repair or replace" a long list of elevator parts "and other mechanical parts—using only *genuine* Otis Parts for this purpose" and, among other things, "to periodically examine all safety devices and governors, and equalize the tension on all hoisting ropes, * * * to examine, lubricate, adjust, and if, in our judgment, conditions warrant, repair or replace" specified "accessory equipment". It also provides, "It is agreed that we are not required to make renewals or repairs necessitated by reason of negligence or misuse of the equipment or by reason of any other cause beyond our control, except ordinary wear and tear. We shall not be required to make safety tests nor to install new attachments on the elevator as recommended or directed to by insurance companies or by governmental authorities, or to make any replacements mentioned herein with parts of a different design. The following items of elevator equipment are not included in this contract: Hatchway Enclosure and Doors and Refinishing of Elevator Cabs. * * * It is agreed that we assume no liability for injuries or damage to persons or property except those directly due to our acts or omissions; and that your responsibility for injuries or damage to persons or property while on or about the elevators referred to is in no way affected by this agreement." The first page contains a statement of belief by Otis

"that the best elevator performance is to be obtained by using every reasonable effort to *prevent trouble* and to avoid difficulties *before they occur*. In this respect a thorough knowledge of the symptoms of trouble and of their correction is far more important than the mere knowledge of how to restore damaged equipment. This is *scientific maintenance* as compared to repair service or merely keeping the elevators running", and the last page has a picture of "A lone man on sentry duty. Not another person in sight. But back of him is a whole army.", under which is a statement, "Under Otis Elevator Maintenance, a lone man may call to examine your elevators. But back of him are supervisors. And back of the supervisors are maintenance experts and planners. And back of the maintenance experts are the Otis engineers. A complete organization built from years of elevator experience. Thus it is that Otis Maintenance is scientifically planned elevator care. It brings you elevator safety . . . freedom from shut-down . . . maximum use of equipment . . . elevator economy. It brings you modern elevator up-keep."

Otis inspectors examined the elevators once a week and, when called upon, oftener. Otis does not "police" how an elevator is operated and says it has no way of doing so. When an elevator installed by Otis is turned over to the owners Otis shows them how to operate it, but does not put signs in the elevator for that purpose. Generally elevators of this kind do have signs, alongside the push buttons in the elevator or outside, as to how it is to be operated. This identical type of elevator is in use elsewhere in Baltimore, in Union Trust Building, St. Paul Garage, Baltimore Life Insurance Building, two in University Hospital, four at Johns Hopkins Hospital, and there are hundreds installed throughout the country. The elevator had no self-leveling device. Otis's general service superintendent for the United States and Canada testified that such a device can be, and frequently is, installed on this type of elevator, but is not standard equipment in the sense that all elevators must be so

equipped, and is not mandatory by any law, rule or regulation. Such a device is very expensive. Excess load may cause this elevator to stop an inch or two below the floor level. Otis's Baltimore service superintendent testified that if the elevator had not been prematurely stopped from the inside by a prior passenger, it would have stopped automatically within a range of approximately one inch of the floor level. Other Otis experts, high and low in its organization, testified to the same effect. This testimony is uncontradicted except so far as plaintiff's testimony may be said to contradict it. An Otis maintenance examiner testified that in December, 1948 in his regular inspection he noticed that the car. had stopped one and one-half or two inches off level on all floors; he immediately sent for help and made the proper adjustments in an hour. On four or five occasions he found that the car had been stopped by the previous user four or five inches below level; he immediately checked the equipment and running of the elevator and found that this was due to no fault of the elevator; this could only have happened through opening the inner door too soon; he had complaints from nobody and notified nobody about this.

On the morning of the accident plaintiff, whose desk was on the fourth floor, went from the fourth floor to the third on the elevator. About half an hour later she returned to the elevator to return to the fourth floor. She testified that she touched the button and waited for the elevator to come; when she touched the button the elevator was not at the floor "because there was no light coming through" the window in the door; "my habit was to look to see if the light showed in the elevator, before I rang the bell; I'm definitely sure of that"; she is sure there was not a light, she definitely remembers that she looked in the window when she walked up there. A pre-trial deposition indicates that she was then far from being sure or definitely remembering. She further testified that she waited about two minutes, "the light appeared through the diamond", coming up from below;

"the light was there, and I judged that it was ready for me to get into the elevator and I took hold of the door"; she pulled the door open, held it while she stepped in, to prevent it from closing, stepped in, "to find no car there and plunged" twelve and one-half inches to the bottom of the car, thereby sustaining the injuries which are the basis of this suit; before she stepped into the elevator, she did not look to see whether the elevator was at the floor level; if she had looked, as she pulled the door open, she would have seen that it was below the floor level and would not have stepped in.

She testified that her experience had been that when she opened the door the elevator "was usually on the level", when she had tried to open the door and the elevator was not on the level, the door would "buck" (*i. e.,* rattle) and would not open, and she "had been instructed that if that door did buck, * * * the floor was not on the level with the floor * * * I have never opened that elevator from the outside, previous to this time, that it was not on the level. * * * I would touch the button for service, to make it come up to the level"; when the elevator did not stop level with the floor she could not tell where it did stop, because she "couldn't tell by the light in the elevator, by the height of the dome, how many feet or inches it would be the light would have to go up for it to appear, and the light was the only guide that I had that the elevator was somewhere near the door to be opened; * * * the only thing I would know would be that the elevator was apparently in front * * * of that door when the light shone through the diamond, and when I took hold of the door to open it, it bucked, as I call it, it resisted my attempt to open it, it showed that it was not on a level and I had to wait until it did come to a level before I could open the door and make entry. * * * I couldn't open the door if it was not on the level, at least all my previous experiences, to any extent, were that". She couldn't watch the light as it came to a stop "because the light is in the ceiling of the car. The diamond is one-third down the door and

the only thing I could see through that diamond would be the general light"; she couldn't take an oath to whether she saw the light go by the diamond, she wouldn't know how far the light might have been above the diamond; "I can definitely say that I never have had the door opened by me when it was six inches below the level. * * * I have given definite oath that the door never opened for me personally when it was not on the level; * * * I have never opened the door myself and stepped down"; at the time of the accident she "felt that that elevator was there or the door would not have opened."

Plaintiff knew that by opening the inner door the car could be stopped and if it were stopped somewhere near the floor, the outer door could be opened and the passengers could step out. She had seen that done when the elevator was "two or three inches, maybe six", below the floor. This never occurred when she was operating the car alone, but if other passengers thus opened the doors she "would step out with them". Her instruction was not to open the inner door until she got to the floor. The only condition that she can remember when she stepped down to enter the elevator was when she and others (not she alone) were waiting for the elevator and someone held the door open while passengers stepped out from below the floor level until those waiting stepped in.

Immediately after the accident Otis was notified by the building company, and its representatives promptly went to the building. Some arrived before the ambulance, before plaintiff was taken from the car. They examined and tested the elevator at length and found it in perfect operating condition. Specifically they found it impossible to make the elevator operate the way plaintiff claims it operated, e. g., to move it to the floor level after it had been stopped within thirteen inches by opening the inside door.

After the accident, the same day, a Government employee put a handmade sign in the elevator, "Do not open

until car comes to a full stop." Some time later Otis, at the insistence of the building company and against its own advice, removed the twenty-seven inch cam from the elevator and substituted an eight inch cam, which reduced from thirteen inches to four the range within which the outer door could be opened. Otis's representatives say that this change is objectionable and dangerous in that it increases the risk of passengers being trapped in the elevator if it is stopped from within more than four inches from the floor level.

In this case the argument has covered a wide range of questions of law. As applied to the facts, the range of actual conflict between opposing contentions is narrow. Except within this narrow range we may, for present purposes, assume the correctness of practically all opposing contentions. Since the pecuniary vicissitudes of this case have aligned together the passenger, legal plaintiff, and the owner and operator of the elevator, the original defendant, now use plaintiff, it is not desirable that we unnecessarily decide questions between those parties or interests, which are not separately represented before us.

We find no evidence that the accident was due to any mechanical defect in the elevator or any negligence in keeping or failing to keep it in repair. Plaintiff argues to the contrary because an Otis witness testified that if the elevator had done what plaintiff thought it had done, viz., stop twelve and one-half inches below the floor without a passenger opening the inner door and thereby stopping it, the elevator would be "out of whack". But the same witness and the other witnesses testified without contradiction that the elevator was not "out of whack" and did not do and could not be made to do what plaintiff thought it had done. The fact that plaintiff did not notice light from the elevator window before, and did notice it after, she pushed the button, together with her statements, reiterated with varying degrees of certainty, as to what the elevator did or did not do "for her personally" or for others, is not legally sufficient to

support an inference that just before the accident the elevator had done something which it had never done before or since and which was contrary to the physical laws relating to its construction and operation. We need not labor the point. If we assume the contrary hypothesis, that the jury could find that the accident was due to miraculous unprecedented behavior of the elevator, then no one was negligent in failing to foresee and prevent such behavior.

It was not argued, at least not expressly, in this court or apparently in the lower court, that an elevator of this type, without a self-leveling device and with a twenty-seven inch cam (the only cam ever used on such an elevator before the accident), was a nuisance, or from the evidence could be found to be a nuisance, or that the use and operation of such an elevator was *per se* negligence on the part of the owner. In *Koester Bakery Co. v. Poller*, 187 Md. 324, 329, 50 A. 2d 234, 236, we said, what already had long been established, "We cannot predicate negligence upon the mere failure to provide the most modern equipment, in the absence of any evidence that the equipment was defective or inadequate." We are not prepared to pronounce wholesale judicial outlawry of yesterday's elevators. Paragraph 9102 of section 910 of the General Elevator Regulations in Chapter 91 "Elevators", of the present (1941) Baltimore Building Code, which was offered in evidence, requires a "hoistway-door interlock", viz., a device "to prevent the opening of a hoistway door from the landing side * * * unless the car is at rest within the landing zone at such hoistway door or is coasting through the landing zone with its operating device in the stop position" and defines "landing zone" as "a zone which extends not more than eighteen inches above or below an elevator landing". In the lower court it was apparently argued that before 1941 the building code did not permit any landing zone at all. The fact that the previous code did not define a landing zone or limit it to thirty-six inches indicates, not that the code exacted perfection

every time an elevator made a stop, but only that it recognized the necessity of some such zone and did not limit it. Again, we need not labor the point. If we assume that an owner is negligent in using and operating an elevator in which a passenger may be injured by stepping in without looking, after some other passenger has prematurely stopped the elevator within a twenty-seven inch "landing zone", it is not negligence for Otis or any other contractor or employee to keep the elevator perfectly safe for anyone who does look before stepping in, or has not been preceded by a passenger who prematurely stopped the elevator. This is equally true whether or not a passenger is negligent in stepping in without looking, or the owner is negligent in not warning the passenger to look or warning other passengers not to stop the elevator prematurely.

One of Otis's basic contentions is that it owed no duty to plaintiff to perform its contract with the building company. If Otis today notifies the building company that at midnight it will, in breach of its contract, cease all maintenance of the elevators, it will thereby incur no tort liability to anyone, either for accidents due to defects which hereafter develop through lack of future repairs or for loss of time or ill health due to lack of elevator service if the building company shuts down the elevators because of Otis's breach of contract. If one contracts with a municipality to furnish water or gas or electricity for public and private purposes and fails to do so, he incurs no tort liability for damage by fire due to lack of water to extinguish the fire or for injury sustained in the darkness due to lack of gas or electricity. The absence of tort liability for breach of contract is not qualified by the distinction between non-feasance and misfeasance. In such cases such a distinction is not between non-performance and "mis-performance" of a contract, but only between conduct, in breach of a contract, which constitutes only a breach of contract and conduct which also constitutes a breach of duty, arising out of the nature of the work under-

taken and the conduct, to third persons. Indeed the distinction denotes a difference between absence and existence of tort liability, but does not appreciably aid in determining whether or not such liability exists. "The Gas Company is not charged with using its electric current in any dangerous manner or, by its use, creating any dangerous condition. What it is charged with is a non-performance of its contract with the City. For such non-performance the greater weight of authority is that it is liable only to the City and that it owes no duty to the general public for which it may be made responsible by an action in tort for negligence" *East Coast Freight Lines v. Consolidated Gas Electric Light and Power Co.*, 187 Md. 385, 402, 50 A. 2d 246, 254; *cf. Consolidated Gas Co. v. Connor*, 114 Md. 140, 156-157, 78 A. 725, 32 L. R. A., N. S., 809, cited and quoted in the case last cited. There is no tort liability to a third person for breach of warranty in the sale of whiskey, *Flaccomio v. Eysink*, 129 Md. 367, 379-380, 100 A. 510, or a gas stove, *State, use of Bond v. Consolidated Gas Electric Light and Power Co.*, 146 Md. 390, 126 A. 105, 42 A. L. R. 1237, by vendors who are not manufacturers. In *MacPherson v. Buick Motor Company*, 217 N. Y. 382, 390, 111 N. E. 1050, 1053, L. R. A. 1916 F, 696, the court, by Judge Cardozo, said "* * * the presence of a known danger, attendant upon a known use, makes vigilance a duty. We have put aside the notion that the duty to safe guard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law."

Plaintiff relies on *MacPherson v. Buick Motor Company*, and a line of cases in various jurisdictions which have followed that case or anticipated its doctrine. In that case it was held that the manufacturer of an automobile, sold by it to a dealer and by the dealer to the plaintiff, was liable in tort to the plaintiff for injuries sustained by collapse of a defective wheel. The

wheel had not been manufactured by the defendant, but had been brought from a reputable wheel manufacturer; the defects in the wheel could have been discovered by the defendant by inspection. In the opinion it was said, "The foundations of this branch of the law, at least in this state, were laid in *Thomas v. Winchester*, 6 N. Y. 397." [217 N. Y. 385, 111 N. E. 1051]. The opinion reviewed a number of later New York cases, some of which had already extended the doctrine of *Thomas v. Winchester*, and virtually recognized that it was itself a further extension of that doctrine. *Thomas v. Winchester* "was distinguished by this court in *State, use of Hartlove v. Fox*, 1894, 79 Md. 514, 29 A. 601, 24 L. R. A. 679, and was followed, in part at least, in *Flaccomio v. Eysink*, 1916, 129 Md. 367, 100 A. 510." *State, use of Joyce v. Hatfield*, 197 Md. 249, 254, 78 A. 2d 754, 756. We have repeatedly applied—and perhaps extended—the original doctrine of *Thomas v. Winchester* with respect to manufacturers of food and beverages, inherently dangerous or likely to become dangeruos through neglect of precautions by the manufacturer. *MacPherson v. Buick Motor Company* has never been expressly approved or disapproved by this court, but has been quoted and distinguished. *State, use of Bond v. Consolidated Gas Electric Light and Power Co., supra,* 398-399. For present purposes we shall assume that *MacPherson v. Buick Motor Company* and the cases which anticipated or followed it are law in Maryland.

In discussing the degree of care required of those who transport passengers in elevators this court has recognized that an elevator, especially if not maintained and operated with great care, "is in many respects a dangerous machine". *Belvedere Building Co. v. Bryan,* 103 Md. 514, 534-538, 64 A. 44; *Wise v. Ackerman,* 76 Md. 375, 389, 25 A. 424, 425; *Owners' Realty Co. v. Richardson,* 158 Md. 367, 148 A. 543. In *Kahner v. Otis Elevator Co.,* 96 App. Div. 169, 89 N. Y. S. 185, cited in *MacPherson v. Buick Motor Company,* it was held that an elevator was a dangerous instrumentality

within the doctrine of *Thomas v. Winchester,* and that one who contracted to repair an elevator owed the same duty to third persons as a manufacturer.

We assume that, within the scope of Otis's undertaking to maintain the elevators, it owed plaintiff the same degree of care that the building company owed her and that it would be liable in tort to plaintiff for the consequences of negligence in respect of that duty. This is a higher degree of care than the judge charged the jury was owed by Otis. The scope of Otis's undertaking does not depend upon the terms of its contract with the building company, though the contract is the first place to look for what it did undertake. It might, however, have actually undertaken more than its contract obligated it to do. In *Van Winkle v. American Steam Boiler Co.,* 52 N. J. L. 240; 19 A. 472, decided twenty-five years before *MacPherson v. Buick* it was held that an insurance company, which insured a steam boiler and under its policy reserved the right, but did not assume the obligation, to inspect, but in fact did repeatedly inspect the boiler, was liable in tort to an adjoining owner for damage by explosion of the boiler, on account of negligence in making its inspections. In *Bollin v. Elevator Construction and Repair Co. Inc.,* 361 Pa. 7, 63 A. 2d 19, 6 A. L. R. 2d 277, it was similarly held with respect to an insurance company which insured an elevator and upon which a duty to inspect was imposed, not by its contract but by statute.

The decisive question is, what was the scope of Otis's undertaking. We assume that there is evidence legally sufficient to show negligence on the part of the building company in failing to warn passengers to "watch their step" and not to stop the car by opening the inner door. If Otis undertook the full duty of the owner in this respect, we assume that Otis would owe the same duty and be liable to the same extent as the building company. If, however, Otis had undertaken only to oil and grease, it would not have been liable for injury sustained through a mechanical defect in the elevator.

Likewise, if it undertook only to inspect the elevator and keep it in repair and operating condition, it would owe no duty with respect to operation of the elevators.

There is no evidence that Otis actually undertook more than it contracted to undertake. Otis's contract to use care "to maintain the entire elevator equipment" means what it says and no more. "Maintenance" does not include operation or supervision of operation or advice regarding operation. Regular weekly inspection by Otis proved sufficient to keep the elevator in repair and "in proper and safe operating condition". We are not prepared to say that the owner would have performed its full duty with respect to operation of the elevator if its agent or representative had visited the building only once a week. In fact, the building company had representatives at the building every day. Otis knew no more—if as much—about how the elevator was being operated than did the building company. Plaintiff argues that the accident shows that the elevator was not "in proper and safe operating condition". Otis's undertaking was not to make the elevator a different kind of elevator or to insure it against improper or negligent operation. The scope of Otis's undertaking is limited to maintenance, as distinguished from operation, not only by the terms of its contract, but also in its not too modest, self-commendatory statements on the front and back pages of the contract. Nothing in these glowing statements goes beyond the scope of the contract. It may also be noted that the jury by its verdict in the third-party action apparently found that Otis had not failed to perform its contract obligations.

Plaintiff cites a number of cases in which elevator companies, which pursuant to contract undertook to maintain or repair elevators, have been held liable to third parties for negligence in performing their undertaking. *Dahms v. General Elevator Company*, 214 Cal. 733, 7 P. 2d 1013 (fall of an elevator caused by broken shaft) ; *Cowles v. Independent Elevator Co., Inc.*, 22 Cal. App. 2d 109, 70 P. 2d 711 (fall of elevator) ; *Sheridan v.*

*Aetna Casualty and Surety Co.*, 3 Wash. 2d 423, 100 P. 2d 1024 (fall into shaft due to defect in automatic closing gate) ; *Brown v. George Pepperdine Foundation,* 23 Cal. 2d 256, 143 P. 2d 929 (fall into shaft due to negligent inspection of lock) ; *Jones v. Otis Elevator Co.,* 231 N. C. 285, 56 S. E. 2d 684 (fall into elevator shaft due to failure to keep in repair) ; *Bollin v. Elevator Construction and Repair Co., Inc., supra,* (fall of elevator due to negligence in repairing). In each of these cases the accident was due to negligence in maintaining the mechanical condition of the elevator and not to negligence in respect of operation. See also cases collected in notes on "Liability for injury in connection with automatic elevator", 57 A. L. R. 960, 6 A. L. R. 2d 391. No case has been cited, and we have found none, in which one who undertakes to maintain or repair has been held liable for failure to warn or instruct as to operation.

Our view as to the scope of Otis's undertaking makes it unnecessary to pass upon any question as to contributory negligence. For the purposes of this opinion we have assumed that plaintiff was not negligent.

Otis offered prayers for a directed verdict; such a verdict should have been directed.

*Judgment reversed, with costs.*