DANIEL STEINBERG *v.* PULLMAN COMPANY.
[No. 54, October Term, 1928.]

330

*Decided January 23rd, 1929.*

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Herbert L. Grymes,* for the appellant.

*Mason P. Morfit,* with whom were *Sappington & Morfit* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The declaration in this case alleges that the plaintiff (appellant here) purchased from the Pullman Company, a body corporate, two tickets, by which he was entitled to use and occupy the drawing room on one of the cars of the appellee attached to the train *en route* from New York City to Star Lake, New York, on July 30th, 1926; "that while walking across the floor of the said drawing room the left foot of the plaintiff was penetrated by a rusty tack negligently and carelessly left lying on the floor by the agents or servants of the defendant corporation, who were then and there in charge of the afore-named car." The declaration further alleges that, by reason of the negligent act or omission of the appellee, its servants or agents, the plaintiff suffered an injury, which has resulted in a permanent disability to the foot of the plaintiff, and which injury required him to abandon his usual occupation, and has lost to him the emoluments of the business to which he otherwise would have been entitled; and that he has been otherwise greatly injured and damaged. There was had a trial by jury in the Court of Common Pleas of Baltimore City, resulting in a verdict for the defendant. The case comes here on appeal from the judgment entered on that verdict.

The record presents five exceptions, four to the rulings of the court on evidence, and the fifth to its action on the prayers. The exceptions taken to the rulings on evidence all go to the sustaining of objections by the defendant to testimony offered in respect to damages resulting from the injury. The plaintiff was employed at the time of the accident on a salary basis as an advertising manager for Schloss Brothers, and, while his salary was continued during the time he was disabled, the testimony sought to be adduced, and to which objections were sustained, was for the purpose of showing that the plaintiff might have received additional compensation for trips such as he had theretofore made in going over the territory in which the advertising was done. The court considered these questions as attempting to show speculative

damages, and refused to allow them. While some of the questions to which objections were sustained may have been proper in laying a foundation for showing loss of extra compensation, we are not prepared to say that the rulings were erroneous; and in the view that we take of the case as a whole, they were certainly not reversible error, for the reason that they all related to the question of damages, necessarily predicated upon the right of recovery, while the jury's verdict denied all recovery. There is no question that damage to the extent of $46 was proven, and if the jury, under the court's instruction, believed that the defendant was liable in damages at all, they would certainly have rendered a verdict for the plaintiff in the amount of at least $46. This eliminates the necessity of passing upon the first four exceptions, unless there was error in the action of the court on the prayers requiring a new trial.

Before discussing the ruling on the prayers, we will state briefly the facts upon which the suit was predicated. According to the testimony of the plaintiff and his wife, who were residents of Baltimore, they were *en route* from their home to Star Lake, New York, for a two weeks vacation; upon arrival in New York City, on July 30th, 1926, they visited relatives, and at about 9.15 P. M. boarded the Pullman car and took possession of a drawing room, to which their tickets entitled them; the porter of the car entered the drawing room first, telling them to wait outside for a few minutes until it was made ready for their occupancy; that they were only required to wait two or three minutes, after which they went in and immediately retired for the night. That the only baggage which they had with them was "just a little hand-bag, an over-night bag," which they handed to the porter and he placed it in the rack; that the plaintiff slept in the berth, while his wife occupied the couch; that the plaintiff awoke about 5.30 o'clock on the morning of July 31st, and getting up for the purpose of calling the porter, stepped on a rusty tack, which punctured the bottom of his foot; that upon feeling the tack, he kicked back with considerable force and

struck the heel of his foot on the edge of the berth; that immediately thereafter he sat back on the bed and raised his foot, and "that tack was sticking there in the sole of my foot"; that he then called his wife, who applied iodine and rang for the porter to come; that not long after, the conductor came, and the accident was reported to him, and the tack shown to the conductor and porter.

The testimony of his wife was practically the same as the plaintiff's. She said that, when they arrived at the train, where they had Pullman reservation, the porter was there with a step; that he followed them to the drawing room; he did not let them enter immediately, but asked them to wait outside perhaps a minute or two; that the berths were all made when they went in; that the only baggage they had with them was the over-night bag, which was placed in the rack, and they retired promptly; that the next morning she had gotten up before her husband, and was in the wash room; when she heard a noise and asked him what had happened, and he called her to him; that at that time he had his foot on the bed, and there was quite a lot of blood on the sheet, and the tack was there; that she took the tack out and applied iodine to the foot and put tissue paper over the wound; that she then rang for the porter.

The conductor of the train testified that he was in charge of a section of train 59, of which the Pullman car on which the plaintiff and his wife were passengers was a part; that he went to the drawing room occupied by the plaintiff and his wife, and the plaintiff said he had stepped on a tack, and showed him the tack; that the color of the carpet of that car was dark green; that there were twenty-three passengers on the car that night, and later on he reported the accident to the Pullman conductor. The porter testified that he had been employed by the Pullman Company as a porter for twenty years; that on July 30th and 31st, 1926, he had served as porter on the car in question; that plaintiff and his wife occupied drawing-room A; that the drawing-room was made up at the time the plaintiff entered the car; that he was

told by the plaintiff to call him thirty minutes before they arrived at Carthage; that he went to the drawing room to call the plaintiff and found that he was up and dressed; at that time he told the plaintiff that the train was late, and a few minutes later he returned to the drawing room in response to a call and was asked by the plaintiff to get the train conductor; that, as near as he could recollect, the plaintiff had two or three bags; that the color of the carpet on the floor of that car was dark, and that it was fastened to the floor of the car with a little peg fastened to the floor, with a ring in the carpet fastened over it; and the carpet on the floor of the drawing room was fastened in the same way; that the car was a steel car and had a cemented floor, and that he had never seen any tacks in the carpet, either in the drawing room or in the body of the car; that he went as far as Ogdensburg, about two hours' run from Carthage; that the accident was reported to him after they left Carthage; that after the train got to Ogdensburg, he, together with the Pullman conductor, made a thorough examination of drawing room A; that he raised the carpet, raised the seat, swept it in the aisle, took the dust-broom, a little straw broom, took the sweepings up and examined them "to see if I could find anything. I did not find anything but the sweepings from the floor of the car"; that he did not find anything to account for the tack being in the drawing room or elsewhere in the car; that he boarded the car that night at Mott Haven Yards, and that he had all the berths ready for the people when they came in at receiving time, at nine o'clock. This witness further testified that he remembered the plaintiff and his wife occupying the drawing room; that it was ready for them when they came; that he does not remember his requesting them to wait outside for any length of time, that it was not necessary, because the room was ready.

The Pullman conductor's testimony was substantially that of the porter, in reference to making an examination of the drawing-room by having it swept out at Ogdensburg. On cross-examination he was asked: "Q. And he swept it out?

A. He did.   Q. And got all the sweepings in the dustpan. How much was in the dustpan? A. Not very much; a few little pieces of dirt, that is about all, pieces that looked like mud, something like that." That the car was a steel car with cement floor; that the supporting part of the berths is made of steel; that there is no wood in the car at all, "only the framework on the cushions would be naturally wood."

The yard foreman at Mott Haven Yards testified that the train in question, and the car in question, were thoroughly cleaned in the usual course by men working under him at Mott Haven Yards on July 30, 1926, the day of the trip in question, between 6.00 and 8.30 P. M., at which time the train left the yard for Grand Central Station; that he 'horoughly inspected the train and car after they had been cleaned, to see that the work was properly done; that when the train left Grand Central Station it was inspected by a Pullman agent and also by a railroad inspector, shortly before the passengers were received at 9 P. M.

The instructions contained in the granted prayers, which the jury were required to apply to the facts in order to reach a determination, disclose that the degree of care which the law exacts of Pullman and sleeping car companies is that of ordinary care consistent with the business in which the defendant was engaged; that it was the duty of the defendant to use all reasonable precaution for the safety of its passengers; that the law does not exact the unreasonable, and that by "reasonable" is meant such conduct as an ordinarily prudent man would exercise under similar circumstances.

It is the settled law of this state that common carriers do not insure their passengers against injury. As far back as *Stockton v. Frey,* 4 Gill, 406, our predecessors quoted with approval what was said by Sir James Mansfield in the case of *Christee v. Griggs,* 2 Camp. Rep. 81: " 'There is a difference between a contract to carry goods, and a contract to carry passengers. For the goods, the carrier was answerable at all events; but he did not warrant the safety of the passengers. His undertaking, as to them, went no further than this, that, as far as human care and foresight could go, he would

provide for their safe conveyance.' * * * This doctrine is sanctioned in the case of *Stockton v. Saltonstall,* 13 Peters, 181. So, also, in 2 *Kent's Commentaries,* 466: 'The proprietors of a stage coach do not warrant the safety of passengers, in the character of common carriers; and they are not responsible for mere accidents to the persons of the passengers, but only for the want of due care.' " In *Western Md. R. R. v. Shivers,* 101 Md. 391, Judge McSherry, speaking for the court, said: "It is undoubtedly true that the carrier is not an insurer of the safety of his passengers. He is bound to use the utmost care and diligence which human foresight can employ. *City Pass. Rwy. Co. v. Nugent,* 86 Md. 356. This is the limit and the measure of the duty which he owes to the passenger. If, in spite of the observance of that degree of precaution, an injury happens to the passenger from an act of God or a *vis major,* no action, in such circumstances, can be maintained. Negligence, and not the mere fact of an injury, is the foundation of the passenger's right to recover. Direct evidence of negligence is not necessary, because negligence, like any other fact, can be established by the proof of circumstances from which its existence may be inferred. The relation of passenger and carrier being established, then, if it should appear that the accident occurred from some abnormal condition in the department of actual transportation, the law raises the presumption that the abnormal condition had its origin in, or was referable to, some antecedent or coincident omission of an imposed duty. Such an omission is negligence, and such negligence, when producing an injury to the passenger, fastens a responsibility on the carrier, unless it be satisfactorily shown that the abnormal condition proceeded from some source in no manner attributable to the carrier."

In *Balto. & O. R. Co. v. Hauer,* 60 Md. 449, it was said: "It is settled, by all respectable authority, that while the carriers of passengers are not insurers of absolute safety, yet they are bound to exercise reasonable care, according to the nature of their contract; and as their employment involves the safety of the lives and limbs of their passengers,

the law requires the highest degree of care which is consistent with the nature of their undertaking. *Warren v. Fitchburg R. R. Co.,* 8 Allen (Mass.) 227; *Balto. & O. R. Co. v. Worthington,* 21 Md. 275; *Coughlan v. Balto. & O. R. Co.,* 24 Md. 84; *Bannon v. Balto. & O. R. Co.,* 24 Md. 108." In *Phila., W. & B. R. Co. v. Anderson,* 72 Md. 519, our predecessors, after adopting this language used in *Gaynor v. Old Colony & N. R. Co.,* 100 Mass. 208: "The plaintiff was a passenger, and while that relation existed the defendants were bound to exercise towards him the utmost care and diligence in providing against those injuries which can be avoided by human foresight," went on to say: "But the degree of care which is exacted of these carriers is subject to a reasonable limitation, it is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be a due regard to its necessary requirements."

It follows from these authorities that, to establish liability of a carrier, negligence of the defendant, its servants or agents, must be alleged and must be shown from the evidence to exist. There is a class of cases in this state and elsewhere which hold that the establishment of the status of passenger and carrier, plus an injury occurring during such relationship, raises a presumption of negligence on the part of the carrier. *Phila., W. & B. R. Co. v. Anderson, supra; Balto. & P. R. Co. v. Swann,* 81 Md. 400, and cases there cited.

Except in those jurisdictions where they have been by statute declared to be common carriers, sleeping car companies are generally held not to be such. "While by the Act of Congress of June 29th, 1906, sleeping car companies are declared to be common carriers, so far as concerns interstate traffic, and state constitutional provisions have imposed upon them a similar status, otherwise, on principle and by the great weight of authority, they are neither common carriers nor innkeepers." 25 *R. C. L.* 24 (sec. 9). In 10 *C. J.* 1168 (sec. 1529) it is said: "Palace and sleeping cars are operated in connection with railroad trains, generally by independent companies that make a business of the ownership and manage-

ment of such cars, and the status of such a company, except where it is declared by a statutory or constitutional provision to be a common carrier, is not that of a common carrier of goods or of passengers, nor that of an innkeeper, although it bears some marked resemblance to each." In 25 *Amer. & Eng. Encyc. of Law* (2d Ed.), p. 1111, it is said: "The sleeping car company, by furnishing cars under a contract with the railway company to be used as sleeping cars by the traveling public, does not assume towards the persons occupying its cars the relation of a carrier, nor undertake the duty of transporting the passengers to their destination, but the obligation which devolves upon it by the sale of a ticket is to grant the purchaser the privilege of riding in its car and of using the additional comforts and conveniences which it furnishes." *Pullman Co. v. Campbell,* 154 U. S. 620, 38 L. Ed. 1070.

While it is seen from these authorities that sleeping car companies are not common carriers, they are, nevertheless, public servants, with such duties and obligations imposed by law in their relationship to the general traveling public as fairly and reasonably pertain to the business and arise out of such relation in the service they undertake to perform. Occupying such a position, they are bound to exercise what would be reasonable care in view of the nature of the business in which they are engaged, and the particular circumstances of any given case, but are not held to that highest degree of care which attaches to a common carrier.

The granted prayers in this case required the jury to find that the sleeping car company exercised ordinary care, and defined ordinary care in this case as being that degree of care which an ordinarily careful and prudent person would have used under similar circumstances. The plaintiff offered three prayers. The third, relating to damages, was granted. The second defined the term "ordinary care." This prayer was granted as offered, with a single modification, which made the definition of ordinary care control throughout all of the prayers, rather than confining it to the first prayer of the plaintiff. In other words, in respect to this prayer the court

adopted the definition of ordinary care as asked for by the plaintiff, and made that definition applicable to ordinary care when used in the other prayers. It clearly appears, therefore, that there was no error in this modification to which the plaintiff could take exception. The first prayer of the plaintiff was rejected, for the apparent and sufficient reason that it assumed the presence of the tack on the floor of the drawing room before the use of the drawing room by the plaintiff. The fact which this prayer assumes was a vital question upon which the jury were bound to pass, because if the tack was not on the floor of the drawing room when the plaintiff entered it, then the defendant could not have been guilty of negligence in not removing it before the plaintiff entered. This first prayer of the plaintiff asked the court to instruct the jury that the degree of care which must be exercised by the defendant, its servants and agents, was ordinary care; and, while rejecting the prayer for the reason pointed out, the court, in defining the degree of care which it was incumbent on the defendant to exercise, employed in effect the same language asked for by the plaintiff. It told the jury that, unless they found from the evidence that the defendant had failed to exercise ordinary care, their verdict should be for the defendant. Under such an instruction, it was left to the jury to determine from the evidence whether the defendant omitted to do any act which an ordinarily prudent and careful person would have done for the safety and convenience of the plaintiff under similar circumstances, or had done any act which an ordinarily prudent and careful person would not have done, which resulted in injury to the plaintiff.

In this case the liability of the defendant depended upon its not discovering the presence of the tack through a failure to use reasonable care under the circumstances or failing to remove it after its being discovered. Under the granted instructions the jury were permitted to find negligence in either of these respects, if the evidence warranted it. The jury could, and evidently did, reach the conclusion that the defendant exercised that degree of care which an ordinarily

340

prudent person would exercise under the circumstances. In addition, the law of the case, embodied in the granted prayers in respect to the degree of care which the defendant was bound to exercise, is the same as that presented by the plaintiff's rejected first prayer; and he cannot be heard to complain of the rejection of his prayer, if the court, either by granting the prayers of the defendant or its own instruction, lays down the same rule as embodied in the rejected prayer. *Western Md. R. Co. v. Carter,* 59 Md. 305. We find no error, and the judgment must be affirmed.

*Judgment affirmed, with costs to the appellee.*