## W. COVER SMITH *v.* BLUE RIDGE TRANSPORTATION COMPANY
[No. 10, January Term, 1937.]

*Decided March 17th, 1937.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Arthur C. Holmes* and *Daniel E. Klein,* for the appellant.

*Leo Weinberg* and *Alexander Armstrong,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

This is an appeal by the plaintiff, a passenger on the bus line of the defendant, a common carrier, from a judgment on a verdict directed for the carrier, in a suit for damages for personal injury sustained by a fall while leaving the bus at the end of the journey.

The plaintiff testified that on or about the 28th day of April, in the year 1933, he purchased a ticket entitling him to transportation in the defendant's motor bus from Frederick, Maryland, to Baltimore City; that he entered the bus at Frederick, passing to a seat which extended entirely across the rear of the bus, and taking a position in the left-hand corner of the bus looking forward, as did four passengers occupying seats with him in the rear; that the width of the aisle between the permanent seats, through which the rear seat passengers passed, was slightly less than fourteen inches; that, when he entered the bus, none of the temporary seats were in use, and there was no obstruction in the aisle.

The uncontradicted testimony shows that the temporary or aisle seats consist of comparatively small horizontal sitting surfaces, with backs to be unfolded from the seats, and raised behind them, and that the auxiliaries are bolted to the side of the permanent seats. When not in use, the backs are folded down on the seats, and the whole then folded up from the side against the edge of the larger or permanent seats, and held in that position by a coil spring, under tension. According to the testimony of A. F. McDonald, the operating manager of the defendant, the spring, surrounding a rod running

through its center, is compressed back into a casting when the seat is put in service, and sits over a button on the casting which holds it in position. A pin on the end of a coupling is designed to keep the spring in line; and when the aisle seats are pulled down, the backs raised from them stand in the way of folding up at the sides, and thus keep the seats in position for use.

It is shown that passengers taking the bus after the plaintiff were accommodated with aisle seats, and those seats, including one immediately in front of the rear seat on the right side, looking forward, were turned down by the chauffeur for this purpose.

When the bus reached its terminal in Baltimore, the forward passengers, including those occupying the aisle seats, proceeded to the front exit, thereby apparently clearing the aisle of the temporary seats. These were followed by three of the passengers who had occupied the rear cross-wise seat with the plaintiff.

According to the plaintiff, when the crowded condition of the bus was relieved, he made several steps to the right, in order to reach the center aisle. He then took a step forward with his left foot, and, just as he did so, the rear aisle seat, attached to the rear permanent seat on his right, dropped from its then folded position and tripped him as he brought his right foot forward; whereby he fell in a squatting position, with the seat wedged between his legs, resulting in serious injury. It is further testified by the plaintiff that the seat was, at the time of the accident, loosely hanging at an angle, and that, when he pushed it with his knee, it did not spring back in normal folded position. With respect to the cause of the fall, testimony on behalf of the plaintiff went no further, except that at the time of the accident he was "looking forward and above the level of the seat."

Oliver E. Murphy, on behalf of the defendant, testified that on the occasion of the accident he drove the bus from Frederick to Baltimore, and that it had come through from Pittsburgh; that, as a part of his duty, he inspected it before leaving Hagerstown, and found no defects in any

part of the equipment; and that the bus reached Baltimore on schedule time. He further testified that the auxiliary seat, then exhibited in the trial court, which was shown to be the identical seat alleged to have been the cause of the accident, had been in use several years before the date of the accident, and that no complaint about its functioning had ever arisen. The witness added that when he inspected the bus at Hagerstown all the auxiliary seats were in working order; "he pulled them down and let them go back to see whether the spring which holds them up was working right"; the next day he drove the bus, it being the first time it was used after its arrival in Baltimore. He inspected it again, before leaving Baltimore, found no defects in any of the seats, and then made his return trip with it. It was lighted as usual when it reached the terminal, and while the passengers were disembarking.

The operating manager of the defendant company testified that as manager he had charge of all maintenance and equipment; that there was a coach card in each bus, which was marked by the driver to indicate any defects found by him. The method of supplemental inspection, he stated, was to make the same when a bus had registered 1,500 additional miles, more or less. His records showed, as to the bus particularly involved, that it had been inspected on April 19th, 1933, and on May 3rd, 1933, and that both inspections showed the condition of all of the seats of the bus as being in safe mechanical order. So far as the witness knew, no complaint from passengers, as to any defect in the operation of auxiliary seats, had been called to his attention during the period since 1929, when the bus in question was put in operation.

During the course of the trial, the plaintiff attempted to testify as to his earning capacity, based upon wages which he received nearly a year before the accident, as a field cost accountant; he being at the time of the accident unemployed. Objection to a question along this line of inquiry was sustained by the trial court, and this forms the basis of the first exception in this appeal.

At the conclusion of the evidence, both that of the plaintiff and defendant, the defendant offered a demurrer prayer for a directed verdict, which was granted, and the plaintiff offered four prayers, all of which were rejected.

The ruling of the trial court on these prayers is presented by the plaintiff's second exception.

Dealing with the above-mentioned exceptions in their inverse order, it may be stated as a general principle of law that defective action in any part of the transportation equipment of a carrier, injuring a passenger, is *prima facie* presumed to be due to neglect of the care required of the carrier. "Under such circumstances, the carrier must show that the accident happened in spite of the exercise by him and his servants, of the greatest degree of care and diligence, practicable under the circumstances. In other words, although the burden of proof is on the plaintiff to show that the injury was occasioned by the negligence of the defendant, yet he discharges this burden and makes out a *prima facie* case, by showing that the accident happened through the failure of some of the means used by the carrier in making the transit." *Balto. & O. R. Co. v. State, use of Mahone,* 63 Md. 135, 136; *Balto. & O. R. Co. v. State, use of Hauer,* 60 Md. 449; *Balto. & O. R. Co. v. Worthington,* 21 Md. 275; *Balto. & O. R. Co. v. State, use of Coughlan,* 24 Md. 84; *Steinberg v. Pullman Co.,* 156 Md. 329, 144 A. 363.

In *Western Maryland R. Co. v. Shivers,* 101 Md. 391, 61 A. 618, 619, it is said: "It is undoubtedly true that a carrier is not an insurer of the safety of his passengers. * * * Negligence, and not the mere fact of an injury, is the foundation of the passenger's right to recover. Direct evidence of negligence is not necessary, because negligence, like any other fact, can be established by the proof of circumstances from which its existence may be inferred. The relation of passenger and carrier being established, then, if it should appear that the accident occurred from some abnormal condition in the department of actual transportation, the law raises the presumption

that the abnormal condition had its origin in, or was referable to, some antecedent or coincident omission of an imposed duty. Such an omission is negligence, and such negligence, when producing an injury to the passenger, fastens a responsibility on the carrier, unless it be satisfactorily shown that that abnormal condition proceeded from some source in no manner attributable to the carrier." *City Pass. R. Co. v. Nugent,* 86 Md. 349, 356, 38 A. 779.

In other words, when once the relation of passenger and carrier is established, it is the duty of the carrier to have its motor bus properly equipped and in good condition, and to furnish and afford proper facilities and conditions for passengers to enter or leave the motor vehicle with safety; and if the carrier fails in this duty, and a passenger is injured, being himself without fault, in consequence, the carrier is liable. *Huddy, Automobile Law,* secs. 162-166, pp. 311-313.

In the instant case, the passenger for hire was in the course of his transportation for hire, and was in the custody and care of the carrier. If we accept the plaintiff's version of the accident as being true, as we are bound to do in passing upon the demurrer prayer, we must concede that the aisle seat dropped to the position at which the plaintiff placed it, through no action on his part. He testified that the level of his vision was above the aisle seat at the time of the accident, because he was then looking ahead and upward. This would seem to be the natural attitude of any passenger leaving the bus, for the reason that he was entitled to assume the aisle was clear of obstruction. Besides, he testified that three of the rear seat passengers had just preceded him down the aisle. His testimony is to the effect that while in the act of moving forward, the aisle seat dropped between his legs and he was tripped and thrown. Under this state of facts, it must be conceded that the seat would not have dropped under normal conditions and hence the doctrine of *res ipsa loquitur* arises from this abnormal drop, with a presumption of negligence on the part of the carrier;

it being the latter's duty to see that it did not drop while passengers were leaving the bus. *Howser v. Cumberland & P. R. Co.,* 80 Md. 146, 30 A. 906.

The application of the doctrine, however, does not preclude the defendant from showing that the accident was not the result of its negligence, and if it can show that it did all that was reasonably expected of a person of ordinary prudence, and that nevertheless an unforeseen failure of the equipment occurred, or that the accident was the result of some latent defect in the same, or the act of a person not under the control of the defendant, it does not follow that the carrier was necessarily guilty of negligence. As was said in *Philadelphia, W. & B. R. Co. v. Anderson,* 72 Md. 519, 20 A. 2, 4: "But the degree of care which is exacted of these carriers is subject to a reasonable limitation. It is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be a due regard to its necessary requirements."

Applying these principles to the case before us, and bearing in mind the peculiar mechanism of the aisle seat, we are unwilling to state as a matter of law that the character of the inspection of the seat, as detailed by the witness for the defendant, fully complies with the inherent duty resting upon it, in order to exonerate it from negligence. As has been shown, the bus in question was put in operation as far back as 1929; the last general inspection was made on April 19th, or nine days previous to the date of the accident; and there is nothing in the record to show that between these dates the bus had not been in continuous use. It is true that the chauffeur testified to having made an inspection at Hagerstown a short while before the bus reached Frederick; but it is also true that his inspection only went to the extent that he pulled the aisle seats down and let them go back, to see whether the spring which held them was working. It may be added that a serious question as to whether any inspection was made by the chauffeur at Hagerstown is raised by the rebuttal testimony of the plaintiff that this

chauffeur was not the driver of the bus at the time the plaintiff boarded it at Frederick, but took charge of it as chauffeur between Frederick and Baltimore. The sufficiency of the inspection, as made by the chauffeur, as well as whether it was made at all, and that of the general inspection, are, therefore, in our opinion, questions of fact which should have been submitted to the jury. *Western Maryland R. Co. v. State, use of Shirk,* 95 Md. 637, 638, 53 A. 969; *Hines v. Watkins,* 137 Md. 211, 215, 112 A. 299; *Winkelmann & Brown Drug Co. v. Colladay,* 88 Md. 78, 91, 40 A. 1078; *Milestone System v. Gasior,* 160 Md. 131, 135, 152 A. 810.

In the trial of the case, and without objection, the plaintiff was permitted to testify to the fact that he was employed by the Arundel Corporation as a cost accountant; that he had worked for the corporation on one of its construction projects until the date of its completion on July 3rd, 1932; that the compensation which he received at the time he ceased to work was forty dollars per week; and that his arrangement with the corporation was that it would call him again when his services were needed. It had not recalled him at the time of the accident; and during the intervening period he was unemployed. At this point in his testimony he was asked the following question: "What was your ability to obtain money for your services, and in what amount, at the time that you were injured?" This question, as hereinbefore intimated, forms the basis of the first exception, the court having sustained an objection thereto. The witness had previously been permitted to testify, without objection, that on four different occasions he had been offered employment in the same line of work by another contractor, during the period between the day of the accident and March, 1934, on which latter date he secured employment with the Public Works Administration of the United States government. The record does not disclose the compensation which he received in the latter employment, but it does disclose that he was so employed at the time of the trial.

In 8 *R. C. L.* 641, sec. 183, it is said: "The general rule

is, that all evidence tending to show the character of the ordinary pursuits followed by the party injured, and the extent to which the injury has prevented and will prevent him from following them, is admissible. Hence, evidence may be adduced as to the extent and nature of the plaintiff's business or employment, his skill and ability therein, and the loss or diminution of capacity to follow it as a consequence of the injury. The rule necessarily permits an inquiry into the capacity of the plaintiff prior to the injury, including his physical condition and his ability to labor or follow his usual vocation, and evidence as to a previous disability, if any, and, as a basis for comparison, proof as to his condition since the injury." And in section 184, page 642, it is stated: "On the issue of lost time or loss of earning capacity the plaintiff may show what his services prior to the injury were reasonably worth, the market value of services in the profession for which he had fitted himself, and his earnings before and at the time of the injury, and after it occurred."

While it is true that the plaintiff was not asked, and did not answer, a question as to his earnings subsequent to the date of the accident, nevertheless, he had been permitted, without objection, to substantially comply with the general principles above quoted. *Ball v. Pardy Const. Co.*, 108 *Conn.* 549, 143 A. 855, 63 *A. L. R.* 141. Without criticizing the form of the particular question now under consideration, we construe its design to obtain from the witness his earning capacity at the time of the accident; and because, by virtue of his prior testimony, he had previously fully advised the jury of the facts to which the question is directed, we find no error in the court's ruling in this respect.

In view of our conclusion with respect to the granting of the defendant's demurrer prayer, the judgment appealed from must be reversed and a new trial awarded.

*Judgment reversed, with costs, and case remanded for a new trial.*

BOND, C. J., filed a dissenting opinion as follows, in which Urner, J., concurs.

The inference that there was a defect in the mechanism of the seat seems to me to lack support in the evidence.

There was no direct testimony to a defect. The plaintiff offered none, and the defendant's evidence was that no defect was found on inspections made before and after the occurrence. The testimony in which any inference of one must find a basis was that, while the bus was at rest, after a full complement of passengers, except for the plaintiff himself, a few ahead of him and one behind, had passed out, the three or four immediately in front of him passing the aisle seat in question without obstruction, he found the seat hanging out between his legs, in such position as to leave only eight inches of the passageway clear. And he added that it failed to remain up beside the permanent seat when he gave it a shove with his knee. This was as far as his proof of obstruction by a seat went. He said he had a definite impression that the seat dropped, but he did not see it until it was hanging out as he described, and therefore he had no actual evidence to offer on the manner of its coming to that position.

The raising of the back from the seat keeps the whole from folding up against the side, yet there is no testimony as to the position of the back then. Therefore if we may, as I doubt, take the plaintiff's testimony as tending to show that the shove he gave with his knee was such as should have caught a seat up if properly folded together to go up, it remains that the inference of a defective condition could not be drawn without evidence of proper folding at the moment to stay up.

The seat had been folded and raised out of the way of the preceding passengers, either by the passenger who had been sitting on it or by the first to pass it. And it was held in its position, out of the way, until three or four had filed by it. That it should then, while the bus was still motionless, hang out between the legs of the next passenger by reason of some defective working seems to me improbable at the outset. And there are other pos-

sibilities left by the evidence. In the moving passengers there were about the seat forces that might well have interfered with its working, brushing against it, perhaps, or even catching in it, and so long as other explanations are possible, there should be no recovery on the basis of any one. *Titlebaum v. Pennsylvania R. Co.,* 167 Md. 397, 405, 174 A. 89. Confirmation of the possibility of other explanations seems to exist in an absence of any complaint by the plaintiff at the time. He did not mention to the driver or any representative of the defendant that he had fallen over the aisle seat. In support of a claim on an accident insurance policy, indeed, he signed a statement that in the jam of the crowded bus he lost his balance and when he attempted to catch himself by grabbing the back of a seat his hand slipped and he fell, twisting his back.