# E. H. KOESTER BAKERY CO. *v.* GEORGE POLLER AND THE BALTIMORE TRANSIT CO.

[No. 26, October Term, 1946.]

*Decided December 12, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Rignal W. Baldwin,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellant.

*Philip S. Ball* and *John M. Butler* for the appellee, the Baltimore Transit Company.

Submitted on brief by *Pierson & Pierson, Albert E. Weir* and *H. A. Pierson* for the appellee, George Poller.

HENDERSON, J., delivered the opinion of the Court.

George Poller sued the Baltimore Transit Company and E. H. Koester Baking Company for personal injuries sustained while he was a passenger on a street car which collided with a bakery truck on Hanover Street in Baltimore City. At the conclusion of the testimony the trial court reserved rulings on motions for directed verdicts by both defendants, and the jury brought in a verdict of $500 against both defendants. The court subsequently granted a motion for judgment *n. o. v.* in favor of the Transit Company and overruled a similar motion filed on behalf of the Baking Company. The co-defendant, E. H. Koester Baking Company has appealed from these rulings.

At the argument of the case in this Court the appellant formally abandoned its claim that there was no evidence legally sufficient to establish liability on the part of the Baking Company. The point pressed, and the sole issue in the case, is whether there was evidence legally sufficient to establish liability on the part of the Transit Company. We entertain no doubt as to the right of the appellant to appeal from the judgment in favor

of the co-defendant, which affected its statutory right of contribution. Code, Art. 50, Sec. 22. Compare *Brotman v. McNamara*, 181 Md. 224, 29 A. 2d 264.

The plaintiff was employed at the Bethlehem-Fairfield Shipyard. On April 16, 1945, he boarded a No. 6 car at Light Street, at about a quarter past five in the morning. It was dark, the streets were wet and there was a slight drizzle of rain. The car had a standing load of over 80 passengers, and weighed approximately 25 tons. The plaintiff obtained a seat next to a window on the right side behind the center door, and dozed off. He was aroused by a heavy impact which threw him against the seat in front, cutting his head and chipping a piece off a front tooth.

The collision occurred about 5:20 A. M. on Hanover Street viaduct, a short distance south of Reedbird Avenue, a street giving access to the city incinerator on the west. Hanover Street runs north and south and is a through or boulevard highway, leading to the dual highway to Annapolis, and points south. It is also the principal highway serving the whole industrial area south of the Patapsco River, and traffic thereon was notoriously heavy during the war period, particularly at the time of changes of shift at the war plants. Double tracks of the Transit Company occupy the center of the street, which is about 50 feet wide, and there is room for two lines of traffic on each side of the tracks. The locality is not thickly built up, for the viaduct borders on Broening Park and the river on one side and traverses a marshy estuary from the point of collision to Brooklyn. North of the point of collision there are only a few filling stations and roadside stands on the west and only one main road leading directly from Hanover Street to the west, known as Cherry Hill Road, which is 1,300 feet north of Reedbird Avenue. At the point of collision, Hanover Street is level, but there is a slight down grade from Cherry Hill Road to Reedbird Avenue. Hanover Street is quite straight from a point north of Cherry Hill Road to Brooklyn.

The motorman testified that he was proceeding at a normal speed of 25 miles per hour. This estimate was corroborated by a number of witnesses. He had no occasion to stop at Cherry Hill Road or Reedbird Avenue. The traffic in both directions was heavy, but the track ahead was clear for a distance of several blocks, the usual interval between street cars. He observed a double line of traffic on his left, and particularly noticed a large white truck in the line nearest to the tracks. When this truck was about 25 feet away, it suddenly cut to its left and came diagonally across in front of the car. He applied his air-brake and sand, but the impact was so instantaneous that he could not apply the brake fully before the crash. He was knocked away from the controls and rendered unconscious. The automatic emergency brakes (known as the "dead man") took charge and brought the car to an abrupt stop. He testified that he could not have stopped in less than 150 feet under the conditions existing. This statement was corroborated by the Transit Company's expert, assuming a speed of 25 miles per hour. This witness also testified that the maximum speed of which the street car was capable, under full power, on a level track after a run of 1,200 feet, was 37 miles per hour.

A crash squad officer testified that when he arrived at the scene a few minutes after the crash, the street car was standing about 80 feet south of Reedbird Avenue. The front of the car was about 20 feet past the body and contents of the truck, which was a light half-ton truck loaded with bakery products. He stated that he could not tell how far the truck had been pushed before it came to rest at the place he saw it.

The truck driver testified that just before the collision he was proceeding north straddling the east rail of the north-bound car tracks. He saw a street car two or three blocks away. To avoid a rough stretch in the paving, he attempted to pull to his left and straddle the west rail of the north-bound car tracks. However, the front wheels skidded on the wet rails, the rear end of the truck

swung to the right, and the truck went into the south-bound tracks. The last thing he remembers was the skidding; the impast occurred while he was still trying to get his truck under control. He was unable to state how far the street car was away when he started to skid. He testified that, based on his own prior experience as a motorman, the street car could have been stopped in a distance of 75 feet.

The testimony upon which the appellant relies to establish negligence is principally that of Lloyd Johnson. This witness, a passenger on the street car, estimated its speed at from 35 to 40 miles per hour. He first noticed the truck when it was about 100 to 125 feet ahead of the street car, over between the two tracks, but not on the south-bound tracks. When the truck was 30 to 40 feet from the street car, it went on an angle and came into the south-bound tracks. Some of the passengers jumped up and started to scream. He did not feel the brakes being applied before the impact. Herbert T. Hughes estimated the speed of the trolley at 30 to 40 miles per hour, "just judging it." He felt no brakes before the impact, and heard no air. Robert Weaver estimated the speed at 35 to 40 miles per hour, although he was not looking out; "all I felt was one impact." Matthew Higgins said the street car was going "fast." In cross-examination he stated that he though 25 miles per hour was "fast" for a street car.

The appellant specifies a number of items that he contends constitutes negligence on the part of the Transit Company. He states that the street car was an old model (it was a Brill, 1930) having no separate emergency brake, and no automatic windshield wiper. He contends that the motorman failed to maintain an adequate lookout. We find no merit in these contentions. We cannot predicate negligence upon the mere failure to provide the most modern equipment, in the absence of any evidence that the equipment was defective or inadequate. The motorman was observing the road ahead, and there is no suggestion of inattention on his part.

There is no dispute as to the fact that the front windows were clear.

The principal contentions of the appellant are that negligence can be inferred from the failure of the motorman to apply the brakes prior to the impact, and from the speed at which the street car was moving.

It may be conceded at the outset that the Transit Company owed the highest degree of care to its passengers for their safety. *Dilley v. Baltimore Transit Company,* 183 Md. 557, 561, 39 A. 2d 469, 155 A. L. R. 627. However, it was not an insurer of safety, but "only bound to employ the utmost care and diligence which human foresight can use." *Baltimore City Pass. Ry. Co. v. Nugent,* 86 Md. 349, 356, 38 A. 779, 781. It also owed its passengers a duty to deliver them to their destination as expeditiously as possible, consistent with safety. As was said in *Smith v. Blue Ridge Transportation Co.,* 172 Md. 42, 49, 191 A. 66, 69 (quoting from *Philadelphia, W. & B. R. Co. v. Anderson,* 72 Md. 519, 526, 20 A. 2) : "The degree of care which is exacted of these carriers is subject to a reasonable limitation. It is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be a due regard to its necessary requirements."

Viewing the testimony in the light most favorable to the plaintiff, the truck was not more than 40 feet from the street car when it entered the south-bound tracks. Even if the street car had been travelling at a speed of 25 miles per hour at that instant, it could not have been stopped in less than a distance of 75 feet. Thus, in any aspect of the case, the collision was inevitable. It is this fact that distinguishes the case at bar from such cases as *Baltimore Transit Co. v. State,* 184 Md. 250, 40 A. 2d 678, where the street car was 160 feet away when the truck entered the tracks, and *Davidson Transfer & Storage Co. v. Baltimore Transit Co.,* 183 Md. 263, 37 A. 2d 326, where the street car was 245 feet away. In *Fillings v. Diehlman,* 168 Md. 306, 177 A. 400, a case strikingly similar to the case at bar, it was held that there

was no legally sufficient evidence of negligence on the part of the Transit Company. This Court said (168 Md. at page 311, 177 A. at page 402) : "It could not be inferred from the evidence that the motorman could have averted a collision with the automobile after he became chargeable with knowledge that there was danger of such an accident. * * * If, as the testimony for the plaintiff indicates, the street car was approximately 135 feet away when the automobile started to skid diagonally across the track, it does not appear to what extent that distance had been reduced when it should have become apparent that the continuously moving automobile would not pass beyond the track in safety." There was no proof, in that case, as to the speed of the car or as to the ability of the motorman to stop it.

If, as we have said, the collision in the case at bar was inevitable, we think the suggestion that the motorman might have reacted more rapidly, when confronted by the emergency, is beside the point. Nor can we assume that the injuries would have been less severe had the brakes been applied at the precise instant that the truck started to skid. The appellant's injuries were entirely due to the sudden stop, which threw him, while in a comatose condition, against the seat ahead. The harder the brakes were applied, the more violent would have been the jolt to the passengers. The appellant contends that the motorman should have anticipated the collision when he first saw the truck, but we think this is untenable. The mere fact that the truck was straddling one of the north-bound rails would not indicate to a reasonable man that it would suddenly and without regard for the approaching street car, leave a place of safety and turn to its left across the tracks.

The contention that the speed of the street car was excessive is not based upon the violation of any statute. Section 157 of Article 66½ of the Code (as codified by Chapter 1007 of the Acts of 1943) sets a maximum speed limit of 30 miles per hour for "vehicles," on ordinary highways in the outlying or not thickly settled part of

a city. But "vehicles" are defined is Section 2 (65) of Article 66½ so as to exclude street-cars operated on stationary tracks or with overhead electric wires. The appellant argues that, by analogy, a speed in excess of 30 miles per hour would be excessive and unreasonable under the existing conditions. But even if we assume, in this case, that top speed was unreasonable, and afforded some evidence of negligence, we think there is no showing that the speed contributed to the happening of the accident.

The cause of the accident was clearly the unexpected, and unforeseeable, entry of the truck upon the tracks at a point where the collision could not have been avoided even if the street car had been travelling at a speed of 25 miles per hour. Under such circumstances it cannot be inferred that the higher speed assumed was a contributing cause. We had occasion to examine the authorities on this point in the recent case of *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537. In that case, and in the cases there cited, it was held that excessive speed is not a concurrent cause, where the primary cause is the unforeseeable, negligent act of a third party, and it appears that the accident would have happened regardless of the excessive speed. We think these cases are controlling here.

The appellant contends, however, that the excessive speed accentuated and aggravated the injuries to the plaintiff, in that the impact would have been slighter had the speed been less. But we think the evidence in this case would not support a finding of aggravation. Whether a lesser injury would have resulted from an emergency stop at 30 miles per hour, than from an emergency stop at 40 miles per hour, is a matter of pure speculation, even if it be assumed that the car could have been stopped in a shorter distance at the slower speed.

On this point the appellant relies chiefly upon the case of *Warner v. Markoe,* 171 Md. 351, 189 A. 260. But in that case there was evidence that the automobile, in which the plaintiff guest was riding, was proceeding at

more than 60 miles per hour, in downtown Baltimore, although warned by one of the passengers to slow down. Moreover, it was a typical case of collision at an intersection uncontrolled by traffic lights or stop signals, where the right of way was dependent to some extent upon the relative promixity of the vehicles to the intersection in point of time. The court pointed out that the excessive speed might in itself have caused surprise and miscalculation on the part of the other driver so as to make it a concurrent cause of the collision. The court expressly distinguished the cases of *Sun Cab Co. v. Faulkner*, **163** Md. **477, 163** A. **194**, and *Monumental Motor Tours v. Becker*, **165** Md. **32, 166** A. **434**, where disregard of the traffic light and invasion of the right of way was held as a matter of law to have been the proximate cause of the collision, rather than the excessive speed of the favored vehicle.

Upon consideration of all the evidence in the case most favorable to the plaintiff, we think the motion for judgment *n. o. v.* in favor of the Transit Company was properly granted.

<em>Judgment affirmed, with costs.</em>