## SMITH *v.* BALTIMORE TRANSIT COMPANY

[No. 63, October Term, 1956.]

530

*Decided January 8, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and MACGILL, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*H. Emslie Parks* and *Z. Townsend Parks, Jr.,* for appellant.

*John E. Boerner,* with whom were *James J. Lindsay* and *Patrick A. O'Doherty* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

The appellant, plaintiff, Mrs. Carolyn Smith, on February 25, 1954, boarded a bus of the Baltimore Transit Co., appellee, defendant, in Baltimore at Saratoga Street, which was northbound on Cathedral Street. She paid her fare and seated herself on the horizontal rear seat which ran all the way across the bus. She was seated directly opposite and at the end of the aisle running between the seats. There was no seat directly opposite her. While she was so seated, the bus stopped and she fell into the aisle on her knees. The evidence showed that the bus stop was caused by a collision between the bus and an unidentified station wagon. Appellant brought suit against the appellee for permanent injuries which she claimed she sustained on this occasion. The jury rendered a verdict in favor of the appellee. From a judgment for costs entered in favor of the appellee, the appellant appeals.

Mrs. Smith testified that she sat on the rear seat of the bus directly in front of the aisle. Her cousin, Mrs. Kammer, who accompanied her, sat to her right. There were single seats in

the bus but they sat on the rear seat in order that they could sit together. As the bus was proceeding north on Cathedral Street, it stopped so suddenly that she "went like I was shot out of a cannon down on my knees, and before I could get up, it started up again with another jerk, and I was twisted and thrown almost to the center where you go out of the door in the center." She was thrown down so hard that her stockings were ripped. When the bus started again she was twisted and thrown over on her back and her head hit the rail near the exit. She did not know why the bus stopped suddenly. It started again immediately after it stopped and before she could get up. The bus then kept on going. Her cousin went to the front and told the bus driver to come back to her. The bus at that time had reached Read Street. The bus driver came back to her, saw that she was hurt, picked her up and put her on the side seat. He then called an ambulance. Someone came and offered her a transfer ticket with which to go to the hospital which she refused. A policeman came and insisted that an ambulance be gotten to take her to the hospital. The ambulance arrived and took her to Mercy Hospital.

Mrs. Edna Kammer testified that she got on the bus with Mrs. Smith and sat alongside of her on the rear seat. She did not think there was anyone else on that seat. The back of a seat was in front of her but there was nothing in front of Mrs. Smith. As they were proceeding north on Cathedral Street the bus stopped with a "sudden jerk". It was so sudden it threw Mrs. Smith to the floor. She tried to grab Mrs. Smith but she went "too fast". She said: "Then, all of a sudden, we had another jerk and it threw her over on her back." She supposed that the second jerk came when the bus started up again. When asked to describe the first "jerk" she said: "Well, I can tell you it was awfully sudden, with such a force, that she went on her knees and, of course, like I told you, it started up again suddenly before she could get up and it threw her on her back." She walked up the aisle, holding on, to inform the bus driver of Mrs. Smith's injury while the bus was in motion. He came back and talked to Mrs. Smith. She did not see the station wagon or the collision. She described the "jerk" as a sudden stop. No one else was thrown on the floor.

Mrs. Dolores Schultz testified that she was a passenger on the bus, seated to the rear on the short seat, on the right hand side at the side exit. She had a shopping bag full of food and "about $30 worth of records in my arm". She did not know either Mrs. Smith or Mrs. Kammer. She stated: "Well, I was sitting right there and all of a sudden the bus stopped violently, and my shopping bag went over and records fell on the floor, and he immediately started up again at a pretty good clip of speed and it stopped the same way. As I say, my records fell to the floor plus the shopping bag, and I went forward too. I looked in the aisle, and there was Mrs. Smith on her knees, and then all of a sudden when it started out again the same way, she was twisted around very much like a rag doll. Someone was trying to grab her arm, and she was twisted and turned, and she went right back on her back." Several voices called out: "Well, get the driver to stop the bus. The woman is actually hurt." Mrs. Kammer went up to the bus driver while the bus was in motion and told him that someone was hurt. He immediately stopped the bus and came back. The bus eventually stopped at Read Street. The bus driver evidently did not know that anyone was hurt and she did not mean to imply that he ignored the lady lying on the floor. He started up immediately. She was not thrown off the seat because, like Mrs. Kammer, she had something to grab. However, she was quite shaken up. She did not see the station wagon.

Walter W. Smith, the bus driver, testified that he had stopped at Franklin and Cathedral Streets and had taken on a passenger. He was proceeding on Cathedral Street north from Franklin to Centre Street at about ten or fifteen miles per hour, down a very "deep down" grade. Cathedral Street was one way northbound, with either three or four lanes for northbound traffic and no parking was allowed. When he was about half way down the block in the curb lane on the right a Chevrolet station wagon going about five miles faster than his bus passed him in the left traffic lane next to the bus. There was no other traffic going north except the bus and the station wagon. As the station wagon reached Centre Street, the driver pulled over a little to the left to make

a left turn up Centre Street. This would take him west on Centre which was an eastbound street. The driver of the Chevrolet then realized he could not go west. The light was green and he, Smith, was going to proceed on because the Chevrolet was in the left lane and he was in the right lane. He had his foot resting on the brakes slowing the bus down as he approached Centre Street. No one wanted to board or alight at Centre Street. . When the driver of the Chevrolet saw the traffic facing him on Centre Street moving eastbound, he swung back into the lane of traffic occupied by the bus. Smith blew the horn because the station wagon was only about twenty or twenty-five feet ahead of him on the down grade. When the driver of the Chevrolet saw the bus "it must have panicked him or something because he got over to my lane and that's where he stopped. He stopped right in the center, and there wasn't enough room then for my bus to get through in that right-hand lane, so I had to apply the brakes, and as I applied the brakes and as I stopped, I hit him on his—on the right corner of his back bumper, and then he pulled on across the street. I thought he was going to stop." The stop was sudden but not violent. He threw on all the airbrakes. When the driver of the Chevrolet slammed on his brakes and stopped, he had to do the same thing. If he had not put on his brakes and stopped, the Chevrolet might have hit the side of the bus and severely injured some of the people. There were a few people standing at that time. The lady who boarded the bus at Franklin Street was standing near the fare box, near him. Just about at the intersection of Centre and Cathedral Streets he touched the right rear bumper of the station wagon on the tip. When he stopped at Centre Street he did not make an inquiry whether anyone on the bus was hurt because the accident did not seem like it was serious enough for anyone to be hurt. He did look around and looked in his rear view mirror but he could not see all the way to the rear because some of the passengers were standing in the aisle. When he started up he made a smooth start because he thought the station wagon, which had pulled over as if it were going to the curb, would stop again. However the station wagon drove up Cathedral Street. Before he could get the license

number it went east on Monument Street. When the bus reached Monument Street he stopped, got out and looked down Monument Street to see whether he could see the Chevrolet but it had disappeared. He returned to the bus, closed the door and started on. He thought he was up to Madison Street when a lady came and told him that her friend was hurt. He stopped the bus, went back, saw the lady, and she told him she had hurt her knees. He asked her whether she wanted to go to the hospital or whether she wanted an ambulance. She told him she wanted a private car, a taxicab. He told her he was not authorized to get it. He drove on up Cathedral Street. When he reached Read the other lady came back again and told him that her friend's knees were hurt. He stopped the bus and waited until another bus going in the same direction came up. He transferred his passengers to the other bus. He called his supervisor, who called the ambulance and carried Mrs. Smith to the hospital. He did not know anyone was hurt until Mrs. Kammer told him. When he found that Mrs. Smith was injured he made inquiry and found that no one else was injured. At the time of the collision the bus stopped only a couple of minutes. He asked several people on the bus if they had seen the tag number on the Chevrolet, but none had seen it.

Mrs. Ellen R. Clapp, called by the appellee, stated that she boarded the bus at Franklin and Cathedral Streets. It started up fairly promptly after she entered. She had paid her fare and, because they were going down hill, she held on to the rail back of the driver's seat. She was aware of the station wagon in front of the bus. There was a green light at Centre. The traffic on Cathedral was northbound. There was some hesitancy, a little irregular driving on the part of the station wagon driver which gave her the feeling that he wanted to make a left turn at Cathedral and Centre which would have been against the traffic on Centre. She said: "I was also aware that the bus stopped to avoid hitting the station wagon when the station wagon came to practically a stop, or I believe a stop, at Centre Street with a green light. The station wagon then proceeded. However, I didn't realize at that moment that we had touched the station wagon. The station wagon pro-

ceeded north on Cathedral Street, and our bus driver in a matter of a moment, or seconds, after the first car had proceeded, proceeded to follow him because the light was still green." The station wagon pulled over continually to the right, proceeding to Mt. Vernon Place, at Monument Street. The bus driver came up to that corner, stopped, opened the door and got out. It was her impression that he was trying to get the license number of the station wagon, which at that time apparently was out of sight. It had been proceeding so rapidly that it was impossible to get the license number. She was standing all the time that the brakes were applied and was not conscious of any impact and did not know that the bus had touched the station wagon until she heard the bus driver say so in court. Although she had a broken hip for a great many years and was still under treatment for it and for some muscular impairment, she was not thrown down. There was a jolt when the brakes were applied. She was not tossed around. She said: "I wasn't tossed around, and I was certainly not thrown down. I remained on my feet. Then, if I remember correctly, I sat down on the seat directly behind the driver, * * *." She did not know that anyone was hurt until the bus stopped at Monument Street. She drove an automobile herself and, if the driver had not applied his brakes, he would have crashed into the rear end of the station wagon. As the bus proceeded down the hill toward Centre Street, in her opinion, it was being operated properly and efficiently. The bus was proceeding at a modest rate of speed. After the stop at Centre Street and after the station wagon started up the hill, the bus started in a fairly normal reaction time "when any driver would start again after he had the go sign." She remembered a lady coming to the bus driver and telling him that a lady had been hurt. She thought the driver was notified about this after the bus stopped at Monument Street.

The question as to whether the appellee was negligent in the sudden stop of the bus at Centre Street was submitted to the jury and a verdict found for the appellee. The appellant claims that the trial court erred in refusing to submit to the jury the question as to whether the bus driver was negligent in starting the bus and proceeding after the collision, without

first ascertaining whether any of the passengers were injured as a result of the collision.

Of course, the Transit Company owed the highest degree of care for the safety of its passengers. *Dilley v. Baltimore Transit Co.,* 183 Md. 557, 561, 39 A. 2d 469, 155 A. L. R. 627. As stated in *City Pass. Ry. Co. v. Nugent,* 86 Md. 349, 356, 38 A. 779, it was not an insurer of the safety of the passengers but "only bound to employ the utmost care and diligence which human foresight can use." The Company also owed its passengers a duty to deliver them to their destination as expeditiously as possible, consistent with safety. *Koester Bakery Co. v. Poller, etc.,* 187 Md. 324, 330, 50 A. 2d 234. As stated in *Smith v. Transportation Co.,* 172 Md. 42, 49, 191 A. 66, quoting from *Phila., W. & B. R. Co. v. Anderson,* 72 Md. 519, 526, 20 A. 2: " 'But the degree of care which is exacted of these carriers is subject to a reasonable limitation. It is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be a due regard to its necessary requirements.' "

The appellant relies on the following quotation from 10 *Am. Juris., Carriers,* Paragraph 1106, page 99: "The generally accepted rule appears to be that if the carrier knows, or under the circumstances should have known, that a passenger has fallen from the train, it is under a duty to take such steps for his protection as are consistent with the safe operation of the train." If the collision had been violent and of some severity, the bus driver might have been put on notice that some of the passengers in the bus might have been injured. The bus driver said he did not know that anyone was hurt and did not make inquiry because the accident did not seem like it was serious enough for anyone to be hurt and further that he touched his right wheel bumper on the tip and the only damage done was a dent in the bumper. Mrs. Clapp, directly behind the bus driver, did not know that anyone was hurt until they stopped at Monument Street and did not know that the bus had touched the station wagon until she heard the bus driver say so in court. Mrs. Schultz, a witness for the appellant, testified on cross-examination that the bus driver evidently did not know anyone was hurt and that she did not mean to im-

ply that he ignored the lady lying on the floor. In *Lusby v. Baltimore Transit Co.,* 195 Md. 118, 123, 72 A. 2d 754, it was said: "And, inasmuch as his primary duty is to operate the bus, he cannot be expected to be constantly scrutinizing the floor space to see what is there. If the allegation had been that the greasy substance had been in the aisle behind him, the appellee would clearly not be bound by his failure not to see it, or to remove it, unless his attention had been specially called to it." See also *Przyborowski v. Baltimore Transit Co.,* 191 Md. 63, 59 A. 2d 687. We are therefore of opinion that to present to the jury the question as to whether it was the duty of the bus driver after the collision to inquire as to appellant's safety before starting the bus, would be to allow it merely to speculate. From all the evidence the bus driver rendered the highest degree of care toward the appellant, consistent with the nature of his business.

The appellant further contends that the trial court erred in refusing to submit to the jury the question as to whether the bus driver was negligent in making the "sudden start after he had stopped at Centre Street." The evidence as to the sudden start comes from the appellant, Mrs. Kammer, and Mrs. Schultz. The appellant said that "it started up again with another jerk". Mrs. Kammer said that there was another jerk when the bus started up again and the jerk was so sudden that it threw the appellant, who was on the floor, over on her back. Mrs. Schultz testified that the bus started out again "all of a sudden" and that the appellant was twisted around. The jerk was not shown to be unusual or extraordinary. *Przyborowski v. Baltimore Transit Co., supra.*

The general authority seems to be that whether recovery, sought by a passenger on a public conveyance based on the claim of a sudden start, is allowed depends upon whether the start was unusual or extraordinary. *Mervine v. Aronomink Transp. Co.,* 348 Pa. 475, 35 A. 2d 255; *Cohn v. Public Service Co-ordinated Transport,* 109 N. J. L. 387, 162 A. 641; *Johnson v. Berkshire St. Ry. Co.,* 292 Mass. 311, 198 N. E. 154. In *Cohen v. Surface Transp. Corp.,* 160 Misc. 247, 289 N. Y. S. 678, Mrs. Cohen entered the bus when all the seats were occupied. She proceeded to the rear, grasped the back of the

last cross seat, and stood in the bus, which proceeded for a few blocks and then stopped at an intersection. It started again and in doing so gave a jerk causing Mrs. Cohen to lose her grip and fall to the floor. The Court there said: "Jerks and other movements are necessary to the operation of busses; describing a jerk, as Mrs. Cohen did, as a violent one, is insufficient of itself to permit of an inference that the same was caused by negligence. * * * That a passenger of a bus is at times in a greater or less degree shaken by the sudden starting and stopping thereof is a matter of common knowledge and experience, and is to be expected to occur until science invents something to prevent it; 'violent jerks,' without evidence of negligence, is not sufficient to raise a question of fact to be submitted to a jury." In *Grinath v. Baltimore & Bel Air Ry. Co.*, 145 Md. 290, 125 A. 604, where there was testimony that the electric car started "with a sudden jerk, so sudden that the windows shook," and where the motorman testified that this was due to the fact that the machinery was not working properly, the negligence of the Company was held to be a question for the jury. In *Washington Ry. & Elec. Co. v. Anderson*, 168 Md. 224, 177 A. 282, the plaintiff testified that after depositing her fare in the box she made a step up with the intention of going back to take a seat. At that time the car started with a "terribly sudden plunge, which was short and terrific". She grabbed the seat but could not hold it and was thrown down. In that case it was held that there was sufficient evidence to present the case to the jury. In *Callis v. United Rys. & Elec. Co.*, 128 Md. 406, 97 A. 715, where the testimony was that the car gave "just a sudden jerk forward", it was held that this was not sufficient to impute negligence. In *Brocato v. United Rys. & Elec. Co.*, 129 Md. 572, 99 A. 792, the testimony was that the plaintiff was in the act of passing through the door of the car and the car started and she fell as a result of the "jerk" in starting. This Court there held that it was not shown from the facts stated that the motion of the car spoken of as a "jerk" was an unusual or extraordinary motion showing any negligence in the operation, and that the case was properly withdrawn from the jury. In *Kaufman v. Baltimore Transit Co.*, 197 Md. 141, 146, 78 A. 2d 464, there was testimony that the car gave a sudden, ter-

rific, and unusually hard jerk. Judge Markell said in that case as to whether such evidence justified an inference of negligence: "Such an inference must be drawn from facts, not from adjectives or other words used by witnesses to characterize the movement, *e. g.*, in the instant case, 'terrific jolt', 'very terrible—very severe jerk or jolt', 'unusually hard jerk'. Cf. *Herholtz v. West Penn. Rys. Co.*, 362 Pa. 501, 66 A. 2d 839." In *Jones v. Baltimore Transit Co.*, 211 Md. 423, 127 A. 2d 649, just decided, there was evidence of the sudden and violent stopping of the bus caused by a car suddenly cutting in front of it. This Court found that there was no negligence on the part of the Company. Judge Hammond said in that case, after quoting from *Kaufman v. Baltimore Transit Co., supra:* "See also for reference to the weakness of adjectival generalizations as the basis for the inference of negligence, a discussion of the cases in *Baltimore Transit Co. v. Sun Cab Co.*, 210 Md. 555, 560." In *Johnston v. Greyhound Corp.*, 139 Fed. Supp. 551, 555, 556, Judge Chestnut, after citing *Kaufman v. Baltimore Transit Co., supra; Przyborowski v. Baltimore Transit Co., supra;* and *Brocato v. United Rys. & Elec. Co., supra,* said: "All these cases deal with suits of passengers against the Baltimore Transit Company or its predecessor. While the circumstances are different in the several cases the general effect of all of them is that a plaintiff passenger does not make out a valid case of negligence, based on an alleged sudden start or stop of a bus or trolley car, merely by adjectival descriptions of the nature of the sudden start or stop, in the absence of some definite, factual incident thereof which makes it so abnormal and extraordinary that it can be legally found to have constituted negligence in operation." We find no such factual incidents here. The appellant, being on the floor in the aisle, almost any start of the bus would move her. There is no evidence that any of the other passengers were at all affected by this alleged sudden start. We are therefore of opinion that the trial judge was correct in not submitting to the jury the question as to whether the sudden start of the bus in this case constituted negligence.

The judgment will be affirmed.

*Judgment affirmed, with costs.*